**PUBALI BANK, Appellant,**

v.

**CITY NATIONAL BANK, the Aristos Group, Jack A. Willis, Robert McGuire, Margo Svikhart, Appellees.**

No. 80–5263.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1981.

Decided May 13, 1982.

As Amended on Denial of Rehearings Sept. 10, 1982.

Don A. Proudfoot, Jr., Los Angeles, Cal. (argued), for appellant; J. Eric Isken, Henry S. David, Graham & James, Los Angeles, Cal., on brief.

Arthur G. Spence, Beverly Hills, Cal., Maichal W. Conlon, Los Angeles, Cal. (argued), for appellees; James P. Tierney, Law Offices of James P. Tierney, Bruce E. Clark, Los Angeles, Cal., on brief.

Before GOODWIN, NELSON and BOOCHEVER, Circuit Judges.

GOODWIN, Circuit Judge.

Pubali Bank (Pubali) appeals from the dismissal of its action for damages for breach of contract, fraud and negligent misrepresentations. We reverse and remand.

The events leading to this action began when Emerald, a Bangladesh corporation, contracted to sell and deliver in Syria a quantity of jute produced in Bangladesh. Having arranged for the jute, Emerald negotiated with Aristos, a California corporation, to charter ships to transport the jute from Bangladesh to Syria. It was apparently necessary to transport the jute on two different vessels at different times.[1] Aristos chartered two vessels for the appropriate time periods. To finance these arrangements, Aristos borrowed money from its regular bank, City National Bank (CNB). Aristos' loans were payable on demand and were initially secured by collateral pledged by the principals of Aristos and others.

Aristos, as disponent owner, and Emerald, as charterer, entered into two charter parties, one for each of the two vessels involved.[2] The charter parties were identical except for vessels, dates, times, cargo quantities and rates charged for carriage of cargo; each required payments of specified amounts in U. S. dollars per measurement ton of cargo transported and demurrage charges for delays in tender of cargo for transport.

Aristos required guaranty of payment. Because U. S. dollars were required, Emerald's Bangladesh bank, Pubali, arranged for its U. S. correspondent, Manufacturers Hanover Bank (MHB), to issue two "standby" or "guaranty" letters of credit, one for each voyage. These letters of credit were on MHB's standard form and showed Emer-

---

1. This circumstance is irrelevant to any problem before us. The issues would have been the same if only one vessel, one voyage and one set of documents had been involved.

2. A witness expert in the negotiation and arbitration of maritime charters characterized these as "voyage" charters, rather than the more familiar "time" and "bareboat" charters.

ald "by order of" Pubali as "applicant," Aristos as "beneficiary," and CNB as "advising bank." The first, covering the earlier of the two shipments, was in the total amount of $396,000, payment of which was conditioned as follows:

"Gentlemen:

"You are authorized to value on Manufacturers Hanover Trust Company, New York, N. Y. by drawing drafts at sight when accompanied by the following documents:

"Beneficiaries [sic] statement purportedly signed by an officer of the Aristos Group (indicating name and title) and purportedly countersigned by an officer of City National Bank (indicating name and title) reading, 'The amount of this drawing $_____ represents funds due us as Messrs. Emerald Industries Inc., (Bangladesh) Limited contracted with us for the carriage of 14,400 measurement tons of jute goods by ocean vessel from the ports of Bangladesh to a port in Syria according to our joint uniform general charter agreement dated November 18, 1976 at a rate of U. S. $27.50 per measurement ton and that said vessels arrived in the port of Chalna Bangladesh and loaded all or part of said contracted cargo but Emerald Industries Inc. (Bangladesh) Ltd. failed to pay for the freight earned per contract despite our demand for payment.' "

The second, covering the later shipment, was virtually identical, except that the total amount was $247,205, the date of the charter was February 15, 1977, the rate was $35 per measurement ton, and the quantity of cargo to be carried was not specified. The charter provided for "approximately" 7,300 measurement tons. By the time the letter of credit was issued, the parties anticipated a shortfall of some three to four hundred tons.

After MHB had issued the letters of credit, CNB released its other collateral securing the Aristos loans and took assignments of the proceeds of the letters, together with beneficiary statements presigned by Aristos.

Despite an alleged delay in tender of the cargo, giving rise to a demurrage claim by Aristos, the jute was transported to Syria and Emerald paid to Aristos' agent in Bangladesh the specified rates per measurement ton for its carriage. These amounts were deposited in due course in Aristos' account with CNB. Thereafter Pubali notified MHB by letter with documentation attached, sending copies, including documentation, to CNB, that Aristos had been paid.

Nevertheless, purportedly relying on the demurrage claim, CNB countersigned the beneficiary statements submitted by Aristos, forwarded them to MHB and drew down the full amounts of the two letters of credit. CNB simultaneously called the Aristos loans and applied the proceeds of the letters against the (almost equal) balances on the loans.[3]

Upon honoring the drafts drawn under the letters of credit, MHB offset the amounts against Pubali's balance with MHB. Pubali then brought this action against Aristos, CNB and various individuals involved with them in this series of transactions to recover the amounts charged against it. The district court, after completion of Pubali's case in chief, granted defendants' motion for involuntary dismissal under Fed.R.Civ.P. 41(b) and entered judgment for defendants; this appeal ensued.

(1) *Did the Beneficiary Statements Contain False Statements?*

■ Appellees contend, and the district court found, that the phrase "freight earned per contract" as used in the specified beneficiary statements included demurrage.[4] The district court also found that

---

**3.** The loans totalled $641,455; the gross proceeds of the letters should have been $643,205. The small discrepancy will no doubt be explained at the resumed trial.

**4.** The district court's formal findings of fact and conclusions of law were prepared by counsel for CNB, and we therefore scrutinize the

findings more strictly than would be necessary if the court itself had drafted them, although we continue to adhere to the clearly erroneous standard of review. *United States v. State of Wash.,* 641 F.2d 1368, 1371 (9th Cir. 1981); *Zweig v. Hearst Corp.,* 594 F.2d 1261, 1263–64 n.2 (9th Cir. 1979); *Photo Electronics Corp. v. England,* 581 F.2d 772, 776–77 (9th Cir. 1978).

none of the defendants made any false statement to MHB or Pubali. Pubali maintains that "freight earned per contract" covers only the rate per ton stated in the letters, and that because that rate had been previously collected in full by Aristos' agent no beneficiary statement could be honestly and properly submitted to draw on the letters of credit.

The district court took the view argued by the appellees, that "freight earned per contract" included demurrage, and so construed the required beneficiary statements. This construction rewrote the terms of the letters of credit as well as the agreement of the parties. It was no accident that the letters of credit were applied for and issued in amounts precisely equal to the product of the specified rates of freight and the specified numbers of tons carried per voyage (except for the slight deviation noted above). Appellees have provided no convincing alternative reading of the letters of credit. The charters themselves sharply distinguished between the amount charged per measurement ton of cargo and demurrage. If demurrage was to be covered by the letters of credit the letters could and should have included a specific amount or other provision for demurrage. *See Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 463 (2nd Cir. 1970) (letter specified portion of credit to cover demurrage). Furthermore, Aristos sent two invoices to Emerald billing it separately for "freight" and "demurrage." On this record, it is clear that all concerned distinguished between the two classes of charges until a dispute arose.

The district court found that the words "freight" and "freight earned per contract" are commonly understood in the ship chartering business to include all sums due under the charter. The testimony of the only expert witness at trial, however, was to the contrary: that "freight" and "demurrage" are two different concepts, referring in this context to two different things. The finding was wholly unsupported and clearly erroneous.

"Freight" is a broad term which may be used with different meanings in different contexts. As used in these letters of credit, however, the term "freight earned per contract" can only refer to the amount calculated in the manner indicated in the earlier part of the same sentence. The slightest doubt is dispelled by the fact that the letters were issued in precise amounts (with the exception noted) of the product of the number of tons and the rate per ton specified in the charter parties and the text of the beneficiary statements. We therefore conclude that at the time the signed beneficiary statements were submitted, the conditions for a draw on the standby letters of credit had not been met, and that Pubali is therefore entitled to reimbursement.[5]

(2) *Is CNB Liable for Submitting the False Beneficiary Statements and Drawing Down the Proceeds?*

In these transactions, CNB occupied two separate roles: (1) advising bank with respect to the letters of credit, and (2) lender-creditor of Aristos holding the assigned letters of credit as security for repayment of the indebtedness of Aristos to it.

We recognize that an advising bank ordinarily has no duty to investigate the factual basis for beneficiary statements unless the letter of credit so instructs. *See generally* Note, Guaranty Letters of Credit: Problems and Possibilities, 16 Ariz.L.Rev. 882 (1974). As assignee of the proceeds of the letters of credit, however, CNB had a direct interest in the payment on letters— an interest not normally held by advising banks. Therefore, when CNB counter-signed the beneficiary statements, it was acting in its own self-interest, rather than merely in the interest of Aristos. CNB had received extensive documentary evidence

5. CNB contests Pubali's standing to complain of a breach of an agreement to which it was not directly a party. However, CNB does not contest Pubali's standing under Cal.Com.Code § 5111, which provides that a beneficiary warrants his statements under a letter of credit to all interested parties, a category which certainly includes Pubali in view of its indemnification of MHB. New York has an identical provision regarding a beneficiary's warranties at U.C.C. § 5-111.

that the freight had been paid before it countersigned the statements to the contrary. Thus, CNB consented to statements it knew were false, and derived a direct benefit from that consent. CNB may not hide behind the cloak of a neutral advising bank in such circumstances, and we accordingly hold CNB jointly liable to Pubali for the false statements.

Solely on the basis of the case made out by Pubali in chief, CNB and Aristos would be jointly liable to Pubali for its losses by reason of the wrongful draw on the letters of credit. If CNB had rested at that point, Pubali would have been entitled to the restoration of the funds drawn against it. The court erred in granting the defendants' motion to dismiss and entering judgment thereon. We express no opinion on the rights of CNB against Aristos or of Aristos against Emerald[6] for recovery of demurrage charges. We likewise leave the liability, if any, of the individual defendants for subsequent determination.

Reversed and remanded.

---

6. On retrial the relationship between Emerald and Aristos may also be relevant, as may CNB's knowledge of that relationship.