**Dessaleng BEYENE and Jean M. Hanson, Plaintiffs,**

v.

**IRVING TRUST COMPANY, Defendant.**

No. 83 Civ. 4067(MEL).

United States District Court,
S.D. New York.

Oct. 31, 1984.

William L. Borden, Washington, D.C., and Maurice M. Krolik, New York City, for plaintiffs.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant; Stephen A. Weiner, Aileen Meyer, New York City, of counsel.

LASKER, District Judge.

The issue presented is whether Irving Trust Company ("Irving") acted properly in refusing to honor a letter of credit issued on behalf of plaintiff Dessaleng Beyene. Irving moves for summary judgment to dismiss the complaint against it on the grounds that it complied with the obligations which apply under the Uniform Cus-

toms and Practice for Documentary Credits ("UCP") of the International Chamber of Commerce,[1] and that plaintiff Jean Hanson lacks standing to maintain this action. Beyene and Hanson oppose the motion on the grounds that there exist material questions of fact which cannot be resolved on a motion for summary judgment. For the reasons set forth below, Irving's motion is granted.

## I.

In March of 1978 Beyene, executive director of the Lynx International Group, Inc., a general merchandising and exchange corporation located in Arlington, Virginia, agreed to sell and to export to Mohammed Sofan, a resident of the Yemen Arab Republic, two prefabricated houses known as "O'Domes." Sofan attempted to finance the purchase through the use of a letter of credit in the amount of $62,400 which was issued by the Yemen Bank for Reconstruction and Development ("YBRD") in August of 1978 in favor of Beyene. YBRD designated Irving as the confirming bank for the letter of credit and Irving subsequently notified Beyene of the letter's terms and conditions. The letter's expiration date was intitially set as October 19, 1978, but it was ultimately extended until May 31, 1979. During the intervening period, Beyene designated the National Bank of Washington ("NBW") as the collecting bank and he notified Irving that he had made assignments to NBW from the letter's proceeds totaling $50,000. The complaint alleges that Irving was also aware that Hanson was entitled to receive $40,000 of the credit, although Irving disputes this proposition and contends that it was unaware until July of 1979, that Han-

son played a role in any of these transactions after the letter had expired.

On May 4, 1979 NBW mailed to Irving all of the documents required under the terms of the letter of credit. According to a summary of events prepared in October 1979 by Paul D. Shaffer, the NBW official responsible for submitting these documents, Ragai S. Nasser, an employee in Irving's letter of credit section, telephoned Shaffer on May 10, 1979 to inform him of five discrepancies in the submitted documents. The two which are relevant in resolution of the issues presented here were (1) that the bill of lading for the O'Domes issued on April 16, 1979 was not presented to Irving within 21 days from that date as required under UCP Article 42 and (2) that the bill of lading listed the party to be notified as Mohammed So*r*an instead of Mohammed So*f*an.[2]

Shaffer's summary states that Nasser agreed to waive the late presentment of the bill of lading discrepancy because he could not confirm the actual date of the bill's receipt by Irving. However, Nasser's affidavit in support of the summary judgment motion makes no mention of any waiver.

Shaffer also testified at his deposition that both he and Nasser discussed the fact that the Soran-Sofan misspelling was "an extremely minor discrepancy,"[3] that Nasser was going to look into the possibility that Irving might honor the credit in spite of the discrepancy but that Irving never waived the discrepancy and continued to maintain that one existed,[4] and that Irving would send to YBRD a cable noting the single misspelling discrepancy and request-

---

**1.** International Chamber of Commerce, Uniform Customs and Practice for Documentary Credits, Publication No. 290 (1975).

**2.** Article 41 provides:

Notwithstanding the requirement of Article 37 that every credit must stipulate an expiry date for presentation of documents, credits must also stipulate a specified period of time after the date of issuance of the Bills of Lading or other shipping documents during which pre-

sentation of documents for payment, acceptance or negotiation must be made. If no such period of time is stipulated in the credit, banks will refuse documents presented to them later than 21 days after the date of issuance of the Bills of Lading or other shipping documents.

**3.** Shaffer Deposition at 101, filed Jan. 14, 1984.

**4.** *Id.* at 48–49, 74, 107.

ing authorization to pay the letter of credit.[5]

As to three remaining discrepancies noted by Irving, NBW mailed to Irving corrected documents on May 25, which Irving claims it did not receive until June 4, after the letter of credit had expired. On June 5, 1979, Irving cabled YBRD for authorization after noting the late presentation of the bill of lading, a discrepancy which Shaffer claims Irving waived, and the misspelling of Sofan's name. Irving subsequently sent three follow up cables to the Yemen bank on June 8, 13, and 21.

According to Shaffer's prepared summary, he spoke with Irving's Nasser on June 25 and was told, in effect, that Sofan had refused to pay due to the discrepancies in the documents presented by NBW to Irving. In an effort to cure the misspelling discrepancy, NBW sent to Irving a corrected bill of lading—identifying So*fan* as the party to be notified—on July 25, although the buyer continued to refuse to authorize payment. Subsequent efforts by Beyene to obtain payment proved unrewarding. Beyene and Hanson then filed suit against Irving and NBW for wrongful dishonor of the letter of credit in the District of Columbia Superior Court but after that case was dismissed as to Irving for lack of personal jurisdiction, they instituted this action against Irving alone in this district.

## II.

Irving argues that it is entitled to summary judgment on the grounds that, *inter alia*, it complied with its obligations under the UCP as a confirming bank and that it was under a duty to pay the proceeds of the letter of credit only if Beyene fully complied with the credit's terms and conditions. Irving contends that three discrepancies in the documents presented by NBW each support its decision not to honor the letter of credit: (1) some corrected documents were received by Irving after the May 31, 1979 expiration date for the letter of credit; (2) NBW presented documents to Irving more than 21 days after the bill of lading was issued on April 16, 1979, contrary to UCP Article 41; and (3) the misspelling of Sofan's name in the bill of lading was a material discrepancy.[6] Plaintiffs respond that the deposition testimony of Paul Shaffer establishes material facts in dispute, as to whether documents were timely presented to Irving and concerning the misspelling of Sofan's name, and that the disputed facts bar an award of summary judgment in Irving's favor.

▪ Plaintiffs are correct that Shaffer's deposition and summary of events differ sharply from Irving's statement of facts and raise questions of fact with regard to whether Irving waived the timeliness discrepancies and whether it is estopped from raising the untimely presentment of the documents in support of its motion. *See Voest-Alpine International Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 684–85 (2d Cir.1983); *Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1237 (5th Cir.1973), *cert. denied,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974). However, review of the Shaffer deposition does not reveal any factual dispute between the parties as to whether the Sofan-Soran misspelling was a material discrepancy. Inasmuch as this discrepancy alone supports granting Irving's motion, plaintiffs' arguments pertaining to this issue are examined in detail.

## III.

The plaintiffs contend that Irving implicitly waived the misspelling discrepancy because Shaffer testified at his deposition that he expected Irving to honor the letter of credit because he considered the misspelling to be "an extremely minor discrep-

---

5. *Id.* at 101–04. This procedure was required under UCP Article 3(c) which provides in relevant part: "[U]ndertakings [by an advising or confirming bank, Irving in this instance,] can neither be amended or cancelled without the agreement of all parties thereto."

6. Irving also asserts that Hanson lacks standing to sue because she had no contractual relationship with Irving.

ancy." Plaintiffs also assert it is possible to infer that Irving did not believe the misspelling warranted dishonoring the letter of credit because the cable which Irving sent to the YBRD on June 5, 1979 noted not only the misspelling but the fact that the bill of lading was not presented within the 21 days required under UCP Article 41. Shaffer testified that Irving's Nasser waived the latter discrepancy and that he and Nasser agreed that the Soran-Sofan misspelling was the only discrepancy to be included in Irving's cable to YBRD. Plaintiffs go on to argue that late presentment of the bill of lading was included in the Irving cable to YBRD because Irving "felt foolish about cabling Yemen for authorization to pay" due to the misspelling discrepancy alone. Plaintiffs also dispute the materiality of the misspelling discrepancy by relying upon Beyene's affidavit which states that the error could have had no practical effect because an Arab name like Sofan's is not translatable into English in a meaningful way and that in Yemen it would not be possible to locate and notify Sofan of delivery of the goods in question based upon his name alone.

Review of the transcript of Shaffer's deposition reveals that Irving did not implicitly waive the misspelling discrepancy. At the outset, Shaffer's testimony regarding his view of the spelling error does not affect Irving's position. Although both Nasser and Shaffer did discuss the fact that the error was a minor one, it is clear that Nasser continued to maintain that a discrepancy existed and that at no time did he waive the mistake.[7] If Shaffer's version of events is assumed to be true, then Irving's act of mentioning in its June 5 cable to YBRD a discrepancy which it waived raises questions about its good faith in dealing with NBW and Beyene. Nevertheless, even if plaintiffs are correct that Irving "felt foolish" about raising the single spelling error with the Yemeni bank, there can be no dispute that Irving treated the misspelling as a discrepancy.

The law is clear that a single discrepancy, including one involving the misspelling of a party's last name, is sufficient to excuse a confirming bank from paying the proceeds of a letter of credit. The court of appeals for this circuit has discussed the "strict compliance" requirements for letters of credit in *Marino Industries v. Chase Manhattan Bank, N.A.*, 686 F.2d 112 (2d Cir.1982). Its analysis is particularly enlightening as to the facts of this case.

"[T]he essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter." *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970); *accord Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 805–06 (4th Cir. 1975); *Anglo-South American Trust Co. v. Uhe*, 261 N.Y. 150, 156–57, 184 N.E. 741, 743 (1933); *Eximetals Corp. v. Guimaraes, S.A.*, 73 A.D.2d 526, 422 N.Y. S.2d 684 (1st Dep't 1979), *aff'd*, 51

---

7. *See* Shaffer Deposition, supra note 3, at 48, 74, 107. The deposition transcript contains the following colloquy between Shaffer and Irving's counsel:

> Q. [By Irving's counsel] Did Mr. Nasser ever waive the misspelling of the name Sofan?
> A. [By Shaffer] Not specifically, no.

*Id.* at 107. In addition, Shaffer acknowledged, in response to a question by plaintiffs' counsel, that Irving did not have to honor the letter of credit due to the misspelling.

> Q. [By plaintiffs' counsel] Now, did you yourself believe that Irving Trust should have paid this credit as of your June 1, 1979 conversation with Mr. Nasser ...?

> A. [By Shaffer] I felt it was a matter of judgment on Irving Trust's part. I myself had mixed feelings. However, I acknowledged that they had the right to not pay it because, no matter how minor the discrepancy, it was a discrepancy. ... In thinking that the discrepancy on the misspelling was a very minor discrepancy, I thought that Irving Trust could have made a judgment call which would have waived the discrepancy, but I felt it was their judgment, because there were valid points on both sides.

*Id.* at 74–75.

N.Y.2d 865, 414 N.E.2d 399, 433 N.Y.S.2d 1019 (1980); H. HARTFIELD, BANK CREDITS & ACCEPTANCES 73 (5th ed. 1974).

The *Courtaulds* case illustrates the operation of the rule. There a bank was held properly to have refused payment under a letter of credit because, although the letter required that the draft be accompanied by an invoice stating that it covered "100% acrylic yarn," the invoice stated only that the goods were "Imported Acrylic Yarn." 528 F.2d at 803.

The rule of strict compliance reflects the fact that a letter of credit is a contract between the bank and the beneficiary of the letter that is separate and distinct from the commercial contract between the beneficiary (usually the seller) and the bank's customer (usually the buyer). The letter of credit is not tied to or dependent upon the underlying commercial transaction. *Venizelos,* 425 F.2d at 464–65; *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 259, 360 N.E.2d 943, 948–392 N.Y. S.2d 265, 270 (1976); *Maurice O'Meara Co. v. National Park Bank,* 239 N.Y. 386, 395, 146 N.E. 636, 639 (1925). In determining whether to pay, the bank looks solely at the letter and the documentation the beneficiary presents, to determine whether the documentation meets the requirements in the letter.

It is the complete separation between the underlying commercial transaction and the letter of credit that gives the letter its utility in financing transactions. The parties to the commercial contract bring in a third party—the bank—to finance the transaction for them. The bank's sole function is the financing; it is not concerned with or involved in the commercial transaction. This restriction simplifies the bank's role and enables it to act quickly and surely. Because the bank is not involved in the commercial transaction, however, all its rights and duties are set out in and defined by the letter of credit. The bank is not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade.

*Marino Industries v. Chase Manhattan Bank, N.A., supra,* 686 F.2d at 114–15. *See also Voest-Alpine Corp. v. Chase Manhattan Bank, supra,* 707 F.2d at 682–83.

■ Here, the Soran-Sofan misspelling in the bill of lading meant that the documents submitted by NBW did not strictly comply with the terms of the letter of credit. As a result, assuming Irving acted improperly when it made note of an additional discrepancy, the fact remains that the undisputed spelling mistake alone was sufficient to excuse Irving's obligation to pay the letter of credit's proceeds to Beyene.

■ Moreover, the quotation above from *Marino* highlights the fact that a confirming bank need not ascertain the magnitude of each discrepancy before its obligation to pay is relieved. Under the rule of "strict compliance," Irving did not have to scrutinize the underlying transaction between Beyene and Sofan, nor did it have to establish whether the misspelling of an Arab name was a meaningful mistake or find that it was a major error before it could claim that a discrepancy in the documents existed.[8] Irving was therefore under no duty to honor the letter of credit.

Defendant's motion for summary judgment is accordingly granted. The complaint is dismissed.

It is so ordered.

---

**8.** Even if a compliance rule of arguably greater liberality applied in this case, *see, e.g., Flagship Cruises Ltd. v. New England Merchants National Bank,* 569 F.2d 699, 705 (1st Cir.1978) ("variance between documents specified and documents submitted is not fatal if there is *no* possibility that the documents could mislead the paying bank to its detriment."), plaintiffs have not established with sufficient certainty that there was no possibility that Irving could have been misled to its detriment by paying Beyene. For example, it is conceivable that the spelling error could have led to the non-delivery or mis-delivery of the O'Domes. To support this theory Irving points out that a June 28, 1979 cable from Beyene to Irving noted that Sofan had not been alerted to the goods' arrival.