BANK OF COCHIN
LIMITED, Plaintiff,

v.

MANUFACTURERS HANOVER TRUST
COMPANY and St. Lucia Enterprises,
Ltd., Defendants.

No. 83 Civ. 1767 (JMC).

United States District Court,
S.D. New York.

July 9, 1985.

Dunn & Zuckerman, New York City (Jeffrey L. Feldman, New York City, of counsel), for plaintiff.

Manufacturers Hanover Trust Co., New York City (Robert N. Rosenblith, New York City, of counsel), for defendants.

## MEMORANDUM DECISION

CANNELLA, Senior District Judge:

Plaintiff's motion for summary judgment is denied. Fed.R.Civ.P. 56(a).

Defendant's motion for summary judgment is granted. Fed.R.Civ.P. 56(b).

## FACTS

Bank of Cochin Limited ["Cochin"], an Indian corporation and the issuer of letter of credit BB/VN/41/80, commenced this diversity action against Manufacturers Hanover Trust Company ["MHT"], a New York corporation that acted as the confirming bank on the letter. Cochin seeks recovery of the amount paid by MHT, thereafter debited to Cochin's account at MHT, on drawings negotiated in New York between MHT and St. Lucia Enterprises, Ltd. ["St. Lucia"]. Codefendant St. Lucia, a purported New York corporation and the letter of credit beneficiary, has perpetrated a large fraud on both banks and nonparty customer Vishwa Niryat (Pvt.) Ltd. ["Vishwa"]. Unfortunately, St. Lucia has vanished and the Court must decide whose shoulders will bear the scam.

The parties agree on the salient events and have presented essentially identical and uncontroverted statements of fact pursuant to Rule 3(g) of the Civil Rules for the Southern District of New York. *See San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 248 (2d Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985).

On February 8, 1980, in Bombay, India, Vishwa requested Cochin to issue an irrevocable letter of credit covering up to $798,-000 for the benefit of St. Lucia. The letter was to have expired on April 15, 1980 and covered the anticipated shipment and purchase of 1,000 metric tons of aluminum melting scrap consisting of aluminum beverage cans.[1]

On February 14, 1980, Cochin requested MHT to supply financial information on St. Lucia. MHT responded by telex the following day that St. Lucia did not maintain an MHT account and that a thorough check of normal credit sources did not reveal any "pertinent" information. On February 22, Cochin conveyed the terms and conditions of the letter of credit to MHT by Telex and requested MHT to advise "St Lucia Enterprises Ltd" of the establishment of the letter and to add MHT's confirmation.[2] The letter of credit was issued subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision), Int'l Chamber of Commerce, Pub. No. 290 ["UCP"].[3]

On February 25, MHT mailed its written advice of the letter of credit establishment

---

1. Vishwa's application for documentary credit required that St. Lucia supply the following documents and shipment conditions as a prerequisite to payment:
    Six copies of signed invoices;
    One set of clean shipped on board bills of lading;
    Notification of shipment to Vishwa;
    A maritime insurance policy covering civil unrest, marine and war risks;
    A certificate of United States origin in triplicate;
    A certificate of analysis from "LLOYDS" [sic] [of London] ["Lloyd's"] confirming the quantity, quality and shipment of the aluminum scrap;
    Shipment by conference or first class vessel;
    Shipment by a non-Pakistani vessel.

2. The documentary and other requirements for the letter of credit set forth in Cochin's telex included:
    Sight drafts of the invoice value in duplicate;
    Six copies of the signed invoices showing that the aluminum was covered under notice 44–ITC(PN) 79;
    One set of clean shipped on board bills of lading to the order of Cochin;
    A certificate of United States origin in triplicate;

A certificate of analysis of the aluminum from Lloyd's;
    Shipment from a United States port to Bombay;
    A marine insurance policy issued by a first class insurance company;
    A packing list in triplicate;
    One set of nonnegotiable documents to be sent directly to Vishwa immediately after shipment documented by a "cable advise" to Vishwa;
    Shipment by conference or first-class vessel.

3. The UCP was revised effective October 1, 1984. UCP, Int'l Chamber of Commerce, Pub. No. 400 (1983). It is axiomatic that the Court must ordinarily apply the law in effect at the time it renders its decision. *See Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *Byrne v. Buffalo Creek Railroad Co.*, 765 F.2d 364, 366 (2d Cir.1985). The letter of credit was, however, governed by the 1974 UCP pursuant to its express terms. *See Marine Midland Grace Trust Co. v. Banco del Pais, S.A.*, 261 F.Supp. 884, 886 n. 1 (S.D.N.Y.1966). Although the application of the 1983 UCP would favor MHT, *see infra,* it would not alter the Court's decision on the motions.

to St. Lucia and confirmed the amended letter on February 29.[4] Cochin amended certain terms of the letter on four occasions in March and April 1980. MHT mailed its advices of these amendments to St. Lucia from March to May and sent copies to Cochin, which were received without comment.[5] The final amended letter of credit contained the following relevant terms and conditions:

a. Sight drafts of the invoice values;

b. Six copies of the signed invoices;

c. One set of clean shipped on board bills of lading;

d. A west European certificate of origin;

e. A certificate of analysis of the aluminum scrap from Lloyd's of London ["Lloyd's"] or another international testings agency;

f. Shipment from a west European port to Bombay;

g. A maritime insurance policy, covernote 429711, to be confirmed by St. Lucia's cable to Oriental Fire and General Insurance Co. ["Oriental"];

h. A packing list in triplicate;

i. One set of nonnegotiable documents to be sent to Vishwa and a confirming cable to Vishwa;

j. A certification from Lloyd's or the shipping company that the ship was a first class or approved non-Pakistani vessel;

k. St. Lucia's certification that it had complied with all terms of the letter of credit;

l. Shipment by May 31, 1980; and

m. Letter of credit expiration on June 15, 1980.

The aluminum was allegedly shipped on May 29, 1980 from Bremen, West Germany to Bombay on the M/V Betelguese. On June 2, St. Lucia established an account at a Manhattan office of Citibank, N.A. ["Citibank"], the collecting bank, in the name of St. Lucia Enterprises, Ltd. On June 9, St. Lucia presented MHT with documents required by the letter of credit and ten sight drafts amounting to $796,603.50,[6] payable to St. Lucia Enterprises. The documents included five copies of the invoices, a clean shipped on board bill of lading, a St. Lucia certification that the aluminum was of west European origin, a certificate of analysis by an international Dutch materials testing agent, a telex confirmation of a telephone message to Oriental that the aluminum had been shipped to Bombay pursuant to covernote 4291, a packing list in triplicate, a St. Lucia certification that one set of nonnego-

---

4. MHT's February 25 form advice listed correctly all the letter of credit conditions. On February 26, MHT requested information from Cochin on the first class insurance company and an explanation as to what documentation was needed to ascertain compliance with shipment by conference or first class vessel. *See* UCP art. 14(b) (1974) (rejecting usage of "first class" to describe issuers of documents), art. 22(b) (1983) (same). Cochin responded on February 28 by amending the letter of credit insurance clause to require that St. Lucia send a cable to Oriental Fire and General Insurance Co. ["Oriental"] citing covernote 429711. Cochin also requested that the shipping company or Lloyd's certify that the shipment was made by first class or approved vessel. The cable and certificate were to be submitted with the other documents. MHT accurately relayed this information to St. Lucia in its February 29 confirming telex.

5. Cochin sent telexes to MHT on March 3, March 15, March 27 and April 29 amending the letter to reflect that shipment should be made from a port in western Europe and extending the shipping date to May 31 and the letter of

credit expiration date to June 15. The inspection clause was also changed to allow a certificate of analysis from Lloyd's or any international agency. Additionally, Cochin requested that St. Lucia produce a certificate that it had duly complied with all terms of the letter of credit.

MHT accurately conveyed these amendments to St. Lucia by written advices dated March 10, March 31, April 8 and May 2. The March 31 advice incorrectly identified the Oriental covernote as 4291, which MHT had properly designated as 429711 in its February 29 confirming advice. Notwithstanding MHT's allegation that Cochin cited covernote 4291, Cochin accurately used covernote 429711 in its telex amendments of February 28 and March 27. Each form of advice sent to St. Lucia and Cochin contained a beneficiary box with the following address: St. Lucia Enterprises, 210 Fifth Avenue, Suite No. 1102, New York, N.Y. 10010.

6. Invoice 36C was for $79,121.70; invoice 36D was for $79,321.20; invoice 36F was for $79,560.60 and invoices 36A, 36B, 36E, 36F, 36G, 36H, 36I and 36J were each for $79,800.

tiable documents had been sent to Vishwa and that Vishwa had been advised by cable, certifications from the shipping company that the M/V Betelguese was an approved first class Panamanian vessel, and a St. Lucia cover letter specifying the documents submitted and requesting payment from MHT. The St. Lucia letter and certifications were on the letterhead of "St. Lucia Enterprises" and were signed by "D Agney".

MHT compared the documents against the requirements of the letter and determined that they complied with all the terms and conditions. On June 13, MHT negotiated the drafts and issued a check for $798,-000 payable to St. Lucia Enterprises. The check was indorsed St. Lucia Enterprises Ltd. and was deposited in the Citibank account on June 17, 1980. Citibank collected the check from MHT through normal banking channels. MHT debited Cochin's account for $798,000 on June 13. MHT sent a copy of its payment advice, the drafts and documents to Cochin by registered air mail on June 13. Unfortunately, Cochin apparently did not receive these documents until June 21. As it turned out, St. Lucia shipped nothing to Vishwa. The documentation submitted to MHT was fraudulent in every regard; indeed, the bills of lading, quality certification and vessel certification were issued by nonexistent corporations. St. Lucia received payment on the letter of credit and Cochin has been unable to locate any party connected with the fraudulent scheme.

Cochin sent a telex to MHT on June 18, inquiring whether St. Lucia had presented documents for negotiation. MHT responded by telex on June 20 that it had paid St. Lucia $798,000 on June 13 and had forwarded the documents to Cochin at that time. On June 21, Cochin sent the following telex to MHT:

> We acknowledge receipt of the documentu [sic] Stop We find certain discrepencies [sic] in the same Stop kindly donot [sic] make payment against the same until we telex you otherwise Stop.

On June 23, MHT replied to Cochin's telex as follows:

> Reference your telex June 21 credit BB VN 4180 our 500748 Stop We note your telex fails to give reason fro [sic] rejection documents as required UCP Article 8 Stop According our records documents fully complied credit terms and beneficiary already paid therefore we cannot accept your refusal of documents.

By telex dated June 27, Cochin informed MHT of alleged defects in the documents apparently uncovered by Vishwa: (1) St. Lucia's cable to Oriental showed the wrong insurance covernote number of 4291 instead of 429711; (2) St. Lucia did not submit "proof" that a set of nonnegotiable documents and confirming cable had been sent to Vishwa; (3) only one set of documents showed the original certificate of origin whereas the rest included only photocopies; and (4) the invoice packing list and certificate of origin were not duly authenticated. Cochin also noted (5) the overpayment of $1,396.50. MHT credited Cochin's account for $1,396.50 and notified Cochin by telex on June 30.

By telex dated July 3, Cochin asked MHT to recredit its account for $796,603.50 and advised MHT that it was returning the letter of credit documents. Cochin also cited an additional discrepancy that (6) MHT had negotiated documents for St. Lucia Enterprises but that the letter of credit was established for St. Lucia Enterprises Ltd. On July 4, Cochin informed MHT by telex that the documents negotiated by MHT contained the following additional defects: (7) only five signed copies of the commercial invoices, rather than six, were forwarded and (8) documents were signed by "D Agney" without specifying his capacity at St. Lucia.

MHT responded by telex of July 14 that Cochin had failed to timely and properly specify the alleged documentary variances as required by article 8 of the 1974 UCP. The telex also noted that Cochin had failed to promptly return the documents or advise MHT that Cochin was holding the documents at MHT's disposal as required by the UCP. MHT asserted in a telex dated July 16 that it still had not received certain

documents from Cochin. The parties exchanged additional telexes confirming and denying that payment was proper. Cochin's Rule 3(g) statement adds the additional allegations that (9) St. Lucia failed to indicate the documents submitted in drawing against the letter of credit, and (10) the shipping company certificate fails to indicate the vessel registration number.

## DISCUSSION

Letter of credit liability cases are particularly appropriate for judicial resolution without trial because they present solely legal issues. *See Dulien Steel Prods., Inc. v. Bankers Trust Co.,* 298 F.2d 836, 837 (2d Cir.1962); *Transamerica Delaval Inc. v. Citibank, N.A.,* 545 F.Supp. 200, 203 (S.D. N.Y.1982). The parties do not dispute the essential facts and agreed in pretrial conference to present joint summary judgment motions. This case raises novel and unsettled issues of letter of credit law concerning confirming bank liability to an issuing bank for wrongful honor of a letter of credit. The law, however, is sufficiently chartered to require summary judgment for MHT.

A letter of credit is a financing mechanism designed to allocate commercial credit risks whereby a bank or other issuer pays an amount of money to a beneficiary upon presentment of documents complying with specified conditions set forth in the letter. The beneficiary, typically the seller of goods to a buyer-customer, uses the letter to substitute the credit of the issuer for the credit of its customer. The customer applies for the letter of credit, specifies the terms of the letter and promises to reimburse the issuer upon honor of the beneficiary's draft. The letter of credit is thus an engagement by the issuer to the beneficiary to cover the customer's agreement to pay money under the customer-beneficiary contract. The reliability and fluidity of the letter of credit are maintained because the issuing bank is concerned exclusively with the documents, not the performance obligations created by the customer-beneficiary contract. Not a contract, the letter of credit has been best described as "a relationship with no perfect analogies but nevertheless a well defined set of rights and obligations." 1 A. Lowenfeld, *International Private Trade* § 5.53 at 103 (1977); *see* B. Kozolchyk, *Letters of Credit,* in 9 *Int'l Encyclopedia of Comparative Law* ch. 5 at 137–40 (1979) (negotiable instrument concept).

The central issue presented by this case is whether St. Lucia's demand for payment from MHT was in compliance with the conditions specified in the letter of credit. Cochin's action for wrongful honor is based upon its assertion that MHT's payment was improper because the documents submitted by St. Lucia did not comply with the letter. Neither the UCP nor the Uniform Commercial Code ["UCC"] specify whether a bank honoring a letter of credit should be guided by a standard of strict compliance or substantial compliance with the terms of the letter.

The great weight of authority in this jurisdiction, and elsewhere, holds that an issuing or confirming bank is usually obligated to honor the beneficiary's draft only when the documents are in strict compliance with the terms of the letter of credit. *See* H. Harfield, *Bank Credits and Acceptances,* 73–74 (5th ed. 1974) (a "basic principle" of letter of credit law is that "[t]he beneficiary must strictly comply with the terms of the credit to compel performance by the bank.... 'There is no room for documents which are almost the same, or which will do just as well' ") (quoting *Equitable Trust Co. v. Dawson Partners,* [1927] 27 Lloyd's List 49, 52); G. McLaughlin, *Commercial Law,* N.Y.L.J., May 8, 1985 at 30 n. 18 (strict compliance standard is "[t]he prevailing view in the United States"). Thus, New York courts have traditionally held that letter of credit law requires a beneficiary to strictly comply with the conditions of the letter. *See Dixon, Irmaos & Cia, Ltda. v. Chase Nat'l Bank,* 144 F.2d 759, 762 (2d Cir.), *cert. denied,* 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1419 (1944); *International Banking Corp. v. Irving Nat'l Bank,* 283 F. 103, 105 (2d Cir.1922); *North American Mfrs. Export Assocs. v. Chase Nat'l Bank,* 77 F.Supp. 55, 55 (S.D.N.Y.1948); *Laudisi v. Ameri-*

can Exch. Nat'l Bank, 239 N.Y. 234, 239–40, 146 N.E. 347, 348 (1924); Bank of Italy v. Merchants Nat'l Bank, 236 N.Y. 106, 109–10, 140 N.E. 211, 212 (1923), cert. denied, 264 U.S. 581, 44 S.Ct. 331, 68 L.Ed. 860 (1924). Additionally, this Court has previously held that "[a] bank's obligation in a letter of credit transaction is defined by the contract between the bank and its customer. It is obliged to pay only if the documents submitted strictly comply with the essential requirements of the letter of credit." Corporacion de Mercadeo Agricola v. Pan American Fruit & Produce Corp., Memorandum Decision at 4–5, 75 Civ. 1611 (JMC) (S.D.N.Y. Apr. 13, 1976), quoted in Corporacion de Mercadeo Agricola v. Mellon Bank, 608 F.2d 43, 48 n. 1 (2d Cir.1979). This principle of strict compliance has been recently reaffirmed by the Second Circuit and the New York Court of Appeals. See Beyene v. Irving Trust Co., 762 F.2d 4, 6 (2d Cir.1985) ("In order to protect the issuing or confirming bank, this absolute duty [of payment to the beneficiary] does not arise unless the terms of the letter have been complied with strictly."); Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 682 (2d Cir.1983) ("[T]he doctrine of strict compliance with the terms of the letter of credit functions to protect the bank which carries the absolute obligation to pay the beneficiary."); Marino Indus. v. Chase Manhattan Bank, N.A., 686 F.2d 112, 114 (2d Cir.1982) (" '[T]he essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter.' ") (quoting Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 465 (2d Cir.1970)); United Commodities-Greece v. Fidelity Int'l Bank, 64 N.Y.2d 449, 455, 478 N.E.2d 172, 174, 489 N.Y.S.2d 31, 33 (1985) ("New York requires strict compliance with the terms of a letter of credit, rather than the more relaxed standard of substantial compliance.") (citations omitted).

Courts and commentators have noted, however, that New York appears to maintain a bifurcated standard of compliance. See, e.g., Transamerica Delaval Inc. v. Citibank, N.A., supra, 545 F.Supp. at 203; Far Eastern Textile, Ltd. v. City Nat'l Bank & Trust, 430 F.Supp. 193, 196–97 (S.D.Ohio 1977); J. Dolan, The Law of Letters of Credit, Commercial and Standby Credits, ¶ 9.03[1][a], at 9–22 to –24 (1984); T. Quinn, Uniform Commercial Code Commentary and Law Digest, ¶ 5-114[A][8], at S5–22 to –24 (cum.supp. no. 1 1984). This approach calls for a strict compliance standard when the bank is sued by the beneficiary for wrongful dishonor but allows for a substantial compliance test when the bank is sued by the customer for wrongful honor. The stated rationale for the bifurcated standard is that it accords the bank flexibility in reacting to "a crossfire of pressures ... especially in times of falling commodity prices," J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 18–6, at 731–32 (quoting State of N.Y. Law Revision Comm'n, Study of Uniform Commercial Code: Article 5-Documentary Letters of Credit, at 66 (1955), reprinted in 3 State of N.Y. Law Revision Comm'n, Report of the Law Revision Comm'n for 1955, at 1634 ["N.Y. U.C.C. Study"], by limiting the liability burden on the bank, which might otherwise be caught between the "rock of a customer insisting on dishonor for highly technical reasons, and the hard place of a beneficiary threatening to sue for wrongful dishonor." B. Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 8.5[4], at 8–48 (1981).

■ MHT correctly asserts that Cochin was its "customer" in this transaction and therefore argues that a substantial compliance standard should be used to test its review of St. Lucia's documents. Although the ultimate customer, Vishwa, may be barred from a direct action against the confirming bank because of the absence of privity, see Kunglig Jarnvagsstyrelsen v. National City Bank, 20 F.2d 307, 308–09 (2d Cir.) (confirming bank has "relation" with issuing bank, not customer), cert. denied, 275 U.S. 497, 48 S.Ct. 121, 72 L.Ed. 392 (1927); Dulien Steel Prods., Inc. v. Bankers Trust Co., 189 F.Supp. 922, 929

(S.D.N.Y.1960) (same), *aff'd*, 298 F.2d 836 (2d Cir.1962); *Linden v. National City Bank*, 12 A.D.2d 69, 70–71, 208 N.Y.S.2d 182, 184 (1960) (same),[7] it is undisputed that MHT owes a duty of care to Cochin, *see* UCP art. 7 (1974), art. 15 (1983). The question then is whether the bifurcated standard applies in a lawsuit by the issuing bank against the confirming bank.

The bifurcated standard is designed to permit the bank to retain flexibility in dealing with simultaneous customer pressure to reject and beneficiary pressure to accept. This discretion ostensibly preserves the bank's ministerial function of dealing solely with documents and the insulation of the letter of credit from performance problems. The difficulty with applying a bifurcated substantial compliance standard to actions against a confirming bank is reflected in the realities of commercial transactions. An issuing bank's good faith discretion is most required when its customer seeks to avoid payment by objecting to inconsequential defects. Although the bank should theoretically take comfort from a substantial compliance test if it honors the beneficiary's drafts over its customer's protests, the bank would usually not want to exercise its discretion in favor of the beneficiary for fear that its right to indemnity would be jeopardized or that its customer would break off existing banking relationships. Accordingly, the looser test of compliance does not in practice completely remove the issuer from its position between a rock and a hard place, but has a built-in safety valve against issuer misuse

if the documents strictly comply with the letter.

■ A confirming bank, by contrast, is usually in relatively close geographical proximity with the beneficiary and typically chosen by the beneficiary because of past dealings. Although the confirming bank should not want to injure purposely its relationship with the issuing bank, the confirming bank would usually be somewhat biased in favor of the beneficiary. Additionally, the confirming bank is not in privity with the ultimate customer, who would be most likely to become dissatisfied if a conflict is resolved by the confirming bank. A biased issuing bank that in bad faith uncovers "microscopic discrepancies", N.Y. U.C.C. Study at 66, would still be forced to honor the letter if the documents are in strict compliance. A biased confirming bank, however, can overlook certain larger variances in its discretion without concomitant liability. A safety mechanism against confirming bank misuse is therefore not present and it would be inequitable to let a confirming bank exercise such discretion under a protective umbrella of substantial compliance. Moreover, the facts of this case do not warrant the looser standard. MHT was not faced with a "cross-fire of pressures" or concern that a disgruntled "customer" would refuse reimbursement because Cochin had sufficient funds on deposit with MHT. The Court also notes that the bifurcated substantial compliance standard is only a suggested approach by courts and commentators and has not actually been followed by New York courts.[8]

---

7. The UCP suggests the better view, however, that there is a duty running from the confirming bank to the ultimate customer. *See* UCP art. 12(a) (1974), art 20(a) (1983) ("Banks utilizing the services of another bank for the purpose of giving effect to the instructions of the applicant for the credit do so for the account and at the risk of [such applicant]."); art. 12(c) (1974), art. 20(c) (1983) (customer indemnification of the confirming bank); *see also Pubali Bank v. City Nat'l Bank*, 676 F.2d 1326, 1329–30 & n. 5 (9th Cir.1982) (warranty and tort liability); *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Ill. Nat'l Bank & Trust Co.*, 530 F.Supp. 279, 282–85 (N.D.Ill.1982) (negligence and fraud); Dann, *Confirming Bank Liability in Letter of Credit Transactions: Whose Bank Is It Anyway?*, 51 Fordham L.Rev. 1219, 1238–53

(1983) (recommending creation of liability through extension of UCC and UCP provisions, negligent misrepresentation and warranty theory).

8. In discussing New York's bifurcated standard, courts and commentators have mistakenly cited each other and the following cases as support for the proposition that New York courts use a bifurcated approach: *Transamerica Delaval Inc. v. Citibank, N.A.*, *supra*; *Data Gen. Corp. v. Citizens Nat'l Bank*, 502 F.Supp. 776 (D.Conn. 1980); *Far Eastern Textile, Ltd. v. City Nat'l Bank & Trust*, *supra*; *Marine Midland Grace Trust Co. v. Banco del Pais, S.A.*, *supra*; *North American Mfrs. Export Assocs. v. Chase Nat'l Bank*, 77 F.Supp. 55 (S.D.N.Y.1948); *Bank of Montreal v. Recknagel*, 109 N.Y. 482, 17 N.E. 217 (1888); *Chairmasters, Inc. v. Public Nat'l Bank &*

Finally, in *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., supra,* the Court implied that confirming bank actions should be judged under a strict standard in wrongful dishonor as well as wrongful honor actions. It ruled that if the confirming bank waived material discrepancies in the drafts, the confirming bank would not be entitled to reimbursement from the issuing bank, which timely discovered the mistakes, because "the issuing bank[ ] was entitled to strict compliance." 707 F.2d at 686. Accordingly, the Court finds that an issuing bank's action for wrongful honor against a confirming bank is governed by a strict compliance standard.

■ An analysis of the ten listed variances suggests that MHT failed to pick up two discrepancies not strictly complying with the letter of credit terms. The first

*Trust Co.,* 283 A.D. 704, 127 N.Y.S.2d 806 (1st Dep't 1954); *Bank of New York & Trust Co. v. Atterbury Bros.,* 226 A.D. 117, 234 N.Y.S. 442 (1st Dep't 1929), *aff'd,* 253 N.Y. 569, 171 N.E. 786 (1930). *See, e.g.,* N.Y. U.C.C. Study, *supra,* at 66; J. Dolan, *supra,* ¶ 9.03[1][a], at 9–22 to –23; T. Quinn, *supra,* ¶ 5–114[A][8] at S5–23 to –24; J. White & R. Summers, § 18–6, at 732. A closer reading of these cases suggests otherwise.

In *Bank of Montreal,* the New York Court of Appeals applied a strict compliance standard when it denied recovery in an action by the issuing bank for reimbursement from its customer who claimed that the bank wrongfully honored the letter of credit. The Court held that the draft advices describing shipments as "bales of hemp" were insufficient to comply with the letter of credit condition for invoices and bills of lading of "bales manilla hemp". In *Atterbury Bros.,* the plaintiff bank successfully sued its customer for reimbursement. The Court acknowledged that the bank took a "risk" by paying pursuant to shipping documents issued to "A. James Brown" when the letter of credit specified "Arthur James Brown". The parties, however, conceded that the intended person signed the documents. The "conclusive" point on the issue of "casein" versus "unground casein" was resolved by an "estoppel" against the customer because it had examined the documents prior to the bank's payment. The remaining objections, characterized as "afterthoughts", were dismissed on grounds of laches and because there was no possibility that a missing certificate could have misled the paying bank. *See, e.g., Beyene v. Irving Trust Co.,* 596 F.Supp. 438, 442 n. 8 (S.D.N.Y.1984), *aff'd,* 762 F.2d 4 (2d Cir.1985). In *North American,* Judge Medina granted summary judgment to the bank

alleged defect concerns St. Lucia's cable to Oriental using the wrong covernote number of 4291 instead of 429711. The insurance was procured by Vishwa and the cable was intended to give notice to Oriental of the shipment by quoting the proper covernote. The failure to provide the correct covernote was not inconsequential as the mistake could have resulted in Oriental's justifiable refusal to honor Vishwa's insurance policy. This mistake may appear immaterial on its face, but in *Beyene v. Irving Trust Co., supra,* 762 F.2d 4, 5–6, the Second Circuit affirmed the dishonor of a letter of credit on the sole ground that the misspelling of Mohammed Sofan as Mohammed Soran on the bill of lading constituted a material discrepancy.

The alleged noncompliance with conditions (2), (3), (4), (8), (9) and (10) is unsup-

against the beneficiary under a "strict compliance" standard. In *Chairmasters,* the court granted summary judgment to the defendant bank under the basic tenet that the bank's obligation to review documents for compliance is totally separate from the underlying transaction. In *Marine Midland,* Judge McLean ruled that letter of credit conditions must be "strictly complied" with by a beneficiary. In *Far Eastern,* the Ohio court used a strict compliance standard, but cited *Marine Midland* as the sole case law authority for its dictum discussion of the New York bifurcated standard, which was the initial judicial recognition of this approach. Similarly, in *Data General,* the Connecticut court cited only *Far Eastern* and *Marine Midland* for its dictum footnote comment on the development of "two different standards". Finally, in *Transamerica Delaval,* citing only *Far Eastern* as case law support, a New York court for the first time discussed the bifurcated standard. The court applied a substantial compliance standard in a lawsuit by a customer against its issuing bank for wrongful honor. The customer used vague language as to what would constitute a proper demand for payment under the letter, necessitating the ruling that it would have been "unreasonable for [the customer] to insist upon strict compliance." This result is better viewed not as an adoption of the bifurcated approach, but as the use of a strict compliance test with the "corollary" that letter requirements must be "explicit" and that all ambiguities should be construed against the party formulating the language in the letter. *See Marino Indus. v. Chase Manhattan Bank, N.A., supra,* 686 F.2d at 115 (all ambiguities construed against the issuing bank in an action for wrongful dishonor by the beneficiary).

ported. These provisions were not explicitly required by the letter of credit. Nothing in the letter indicates that these requirements, some of which were essentially satisfied by the submitted documents, were implicit conditions for payment. If Vishwa or Cochin wanted additional protection, they could have requested it and so informed MHT.

The overpayment and overdebiting of $1,396.50, the fifth alleged error, is a mathematical mistake. Although this sum was reimbursed, it indicates that the documents were not carefully reviewed by MHT. It does not, however, affect whether or not the underlying documents were in compliance with the letter.

The sixth defect is that the payment was made on documents presented by St. Lucia Enterprises despite the fact that the letter of credit was established for St. Lucia Enterprises, *Ltd.* The result is similar to that caused by the deviation of the Oriental covernote. Although there does not appear to be any difference between the two entities, it is not clear that the "intended" party was paid. The difference in names could also possibly be an indicia of unreliability or forgery.

■ The seventh alleged defect is that only five copies of the documents, rather than six, were submitted to MHT. This deviation is similar to a hypothetical error not affecting strict compliance posited in *Beyene v. Irving Trust Co., supra,* 762 F.2d 4, 6 ("Smith misspelled as Smithh"). These types of variances may be allowable "if there is no possibility that the documents could mislead the paying bank to its detriment." *Flagship Cruises, Ltd. v. New England Merchants Nat'l Bank,* 569 F.2d 699, 705 (1st Cir.1978); *see Beyene v. Irving Trust Co.,* 596 F.Supp. 438, 442 n. 8 (S.D.N.Y.1984), *aff'd,* 762 F.2d 4 (2d Cir. 1985). The Court finds that the failure to provide a sixth set of identical documents could not have misled the bank and therefore, it does not violate the strict compliance standard.

In the final analysis, only the variances as to the Oriental covernote and the name St. Lucia Enterprises, Ltd., appear not to comply strictly with the letter of credit conditions. The inquiry is not ended at this point because courts in this Circuit have applied concepts of equitable waiver and estoppel in cases of issuer dishonor. Application of estoppel has been premised upon discoverable nonconformities that could have been cured by the beneficiary before the expiration of the letter, but were not raised by the issuing bank until its dishonor. The banks were estopped from asserting the variances because of previous assurances to the beneficiary of documentary compliance or because of silence coupled with the retention of nonconforming documents for an unreasonably long time after the beneficiary had submitted its drafts for payment. *See Marino Indus. v. Chase Manhattan Bank, N.A., supra,* 686 F.2d at 116–118; *Data Gen. Corp. v. Citizens Nat'l Bank,* 502 F.Supp. 776, 786 (D.Conn. 1980); *U.S. Indus. v. Second New Haven Bank,* 462 F.Supp. 662, 666 (D.Conn.1978).

Application of waiver has been predicated upon situations in which the issuer justifies dishonor on grounds later found to have been unjustified. In these instances, all other possible grounds for dishonor are deemed to have been waived. *See Corporacion de Mercadeo Agricola v. Mellon Bank, supra,* 608 F.2d at 48–49; *Bank of Canton, Ltd. v. Republic Nat'l Bank,* 509 F.Supp. 1310, 1317 (S.D.N.Y.), *aff'd,* 636 F.2d 30 (2d Cir.1980). Waiver of nonconforming documents can also be found from statements by officials of the issuing bank or from customer authorization. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., supra,* 707 F.2d at 684–85; *Marino Indus. v. Chase Manhattan Bank, N.A., supra,* 686 F.2d at 117; *International Leather Distribs., Inc. v. Chase Manhattan Bank, N.A.,* 464 F.Supp. 1197, 1201 (S.D.N.Y.), *aff'd,* 607 F.2d 996 (2d Cir.1979).

■ The *quid pro quo* for the application of a standard of strict compliance is that there be minimal obligations implicating waiver and estoppel defenses on the party benefiting from the literal compliance review. The UCP expressly provides that an issuer has the obligation to immediately notify the beneficiary by "expeditious means" of any reason for noncompliance

and the physical disposition of the disputed documents. UCP art. 8(e) (1974), 16(d) (1983). The UCP also implicitly invites cure of any documentary deficiencies apparent before the letter of credit expiration by issuer notification to the beneficiary. See Thier, *Letters of Credit: A Solution to the Problem of Documentary Compliance*, 50 Fordham L.Rev. 848, 873–76 (1982) (advocating imposition of affirmative obligations on all parties to the letter). In the context of this case, "[a]n equitable approach to a strict compliance standard demands that the issuer promptly communicate all documentary defects to the beneficiary [or confirming bank], when time exists under the letter to remedy the nonconformity." *Id.* at 873. The Court finds that Cochin is precluded from claiming wrongful honor because of its failure to comply with the explicit notice and affirmative obligation provisions of the UCP and its implicit duty to promptly cure discoverable defects in MHT's confirming advices to St. Lucia.

The issuing bank must give notice "without delay" that the documents received are (1) being "held at the disposal" of the remitting or confirming bank or (2) "are being returned" to the second bank. UCP art. 8(e) (1974), art. 16(d) (1983). An issuing bank that fails to return or hold the documents for the second bank is precluded from asserting that the negotiation and payment were not effected in accordance with the letter of credit requirements. UCP art. 8(f) (1974), 16(e) (1983); see *Manufacturer's [sic] Hanover Trust Co. v. Westport Bank & Trust Co.*, Ruling on Cross-Motion for Summary Judgment at 9–10, B–83–17 (TPS/TFGD) (D.Conn.) (issuing bank precluded from pursuing a strict compliance defense for wrongful dishonor because of its "crucial" failure to give "formal notice" that documents were being held for beneficiary despite a retrospective assertion that the documents were always available for inspection), *endorsement approval*, B–83–17 (TFGD) (D.Conn.1983). The UCP also directs that an issuing bank intending to claim noncompliance shall have a "reasonable time" to examine the documents after presentment and to determine whether to make such a claim. UCP art. 8(d) (1974), art. 16(c) (1983). The revised UCP allows explicitly for the imposition of the 16(e) sanction for failure to comply with the "reasonable time" provision as well; however, this interpretation is not clear under the parties' explicit choice of law, the 1974 UCP.

Neither the 1983 UCP nor the 1974 UCP defines what constitutes a "reasonable time" to determine if the documents are defective or notice "without delay" that the documents are being held or returned. When the UCP is silent or ambiguous, analogous UCC provisions may be utilized if consistent with the UCP. *See First Commercial Bank v. Gotham*, 64 N.Y.2d 287, 295 & n. 4, 475 N.E.2d 1255, 1259 & n. 4, 486 N.Y.S.2d 715, 719 n. 4 (1985); *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 258 n. 2, 360 N.E.2d 943, 947 n. 2, 392 N.Y.S.2d 265, 269 n. 2 (1976); *Eljay Jrs., Inc. v. Rahda Exports*, 99 A.D.2d 408, 409, 470 N.Y.S.2d 12, 14 (1st Dep't 1984). The UCC provides for a period of three banking days for the issuer to honor or reject a documentary draft for payment. N.Y. U.C.C. § 5–112(1)(a) (McKinney's 1964) (issuer-beneficiary relationship). The letter of credit was issued subject to the 1974 UCP but it is silent as to what law governs its terms. Cochin cites to Indian statutes interpreting a "reasonable time" as a factual question depending on the nature of the negotiable instrument and the usual course of dealing. Under the circumstances of this case, however, it appears that under New York's comparative interest choice of law approach, New York UCC law would apply. *See, e.g., J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.*, 37 N.Y.2d 220, 226–27, 333 N.E.2d 168, 174–75, 371 N.Y.S.2d 892, 898–99 (applying New York law to letter of credit litigation because of the "vast amount of international letter of credit business" in the state and because the parties listed dollars as the form of payment), *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975).

Cochin's failure to promptly notify MHT that it had returned the documents or that

it was holding them at MHT's disposal thus violates the UCP. Cochin's telex of June 21 states that there are certain discrepancies in St. Lucia's documents, but Cochin did not advise MHT that it was returning the documents to MHT until the July 3 telex. The "reasonable time" three-day period should be the maximum time allowable for the notification "without delay" requirement. Because June 21, 1980 was a Saturday, Cochin should have complied with its notice obligations no later than June 26. The passage of an additional week before compliance precludes Cochin from asserting its wrongful honor claim. Moreover, it was not until June 27 that Cochin first specified any reason for its dishonor argument, and the St. Lucia Enterprises, *Ltd.* omission was not noted until July 4.

Cochin proposes that its failure to timely notify MHT was not violative of UCP or letter of credit policy because it caused no additional loss to MHT. Cochin argues that the defects were in any case incurable by the time Cochin received the documents, because St. Lucia had disappeared with the letter of credit proceeds. Although the UCP is not explicit, the Court finds that these provisions should be applied identically to an issuing bank's obligations to a confirming bank after the latter's honor of a demand for payment. Cochin's contention ignores the expectation in the international financial community that the parties will live up to their statutory obligations and is at odds with the basic letter of credit tenet that banks deal solely with documents, not in goods. Cochin's argument would defeat the letter of credit's function of being a swift, fluid and reliable financing device. *Cf. Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., supra,* 707 F.2d at 684–85 (rejecting contention that a waiver analysis was inappropriate because the defects were "incurable").

Finally, the two documentary discrepancies could have been anticipated by Cochin and were curable before the demand for payment. Cochin received a copy of MHT's incorrect March 31 advice to St.

Lucia, which mistakenly listed the insurance covernote as 4291. Similarly, Cochin received copies of all of MHT's advices to St. Lucia, which omitted the "Ltd." from the corporate name. Cochin had sufficient notice and time to correct MHT's confirming defects to St. Lucia and is therefore estopped from asserting them. Although MHT failed to strictly comply with the letter requirements, Cochin's failure to perform its affirmative obligations precludes an action for wrongful honor under the UCP and by letter of credit estoppel.

### CONCLUSION

Accordingly, for the foregoing reasons, plaintiff's motion for summary judgment is denied, Fed.R.Civ.P. 56(a), and defendant's motion for summary judgment is granted, Fed.R.Civ.P. 56(b).

The Clerk of the Court is directed to dismiss the complaint and prepare and enter Judgment for defendant MHT.

SO ORDERED.