**MARINO INDUSTRIES CORP., Plaintiff-Appellant, Cross-Appellee,**

v.

**The CHASE MANHATTAN BANK, N.A., Defendant-Appellee, Cross-Appellant.**

**Nos. 875, 879, Dockets 81–7706, 81–7726.**

United States Court of Appeals, Second Circuit.

Argued March 22, 1982.

Decided Aug. 11, 1982.

Morris B. Abram, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, David Zwiebel and Gerald Zisholtz, New York City, of counsel), for plaintiff-appellant, cross-appellee Marino Industries Corp.

Laura Effel, New York City (Andrew S. O'Connor, New York City, of counsel), for defendant-appellee, cross-appellant Chase Manhattan Bank, N.A.

Before LUMBARD, Senior Circuit Judge, OAKES, Circuit Judge, and FRIEDMAN,* Chief Judge, United States Court of Claims.

---

\* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

FRIEDMAN, Chief Judge, United States Court of Claims:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York entered upon the opinion of United States Magistrate John L. Caden dismissing, after trial, a suit seeking recovery under two letters of credit that the defendant, Chase Manhattan Bank ("Chase"), issued to the plaintiff, Marino Industries Corp. ("Marino"). The magistrate held that Chase justifiably refused to pay under the letters because Marino had not complied with the requirements in the letters for obtaining payment. We affirm in part, reverse in part, and remand for further proceedings.

## I.

The dispute grew out of a contract under which Marino, a manufacturer of construction materials, agreed with Bautechnik GmbH, a German company, to ship material to a job site in Kassim, Saudi Arabia. At Bautechnik's request, the Berliner Bank in West Germany issued two similar irrevocable letters of credit in favor of Marino. Chase confirmed the letters. One letter was for $212,456.48, and the other was for $489,956.41. Both letters explicitly were subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision), International Chamber of Commerce Publication No. 290, which, under New York laws, supersedes the Uniform Commercial Code. N.Y.U.C.C. Law § 5–102(4) (McKinney 1964).

Each letter was to be paid in two installments: 40 percent when the goods were shipped and 60 percent when they were received. The letters contained detailed requirements that Marino was required to follow to obtain payment. Marino shipped all the goods to Saudi Arabia. After Bautechnik went bankrupt in late November or early December 1980, Chase refused to pay three of Marino's drafts under the letters, on the ground that Marino had not complied with the requirements for payment.

The complaint, filed in the district court after the suit had been transferred from the New York State Supreme Court where it originally had been filed, contains two counts. Count I seeks recovery of $99,-083.80 for Chase's refusal to pay the plaintiff's draft for that amount under the first letter of credit. Count II seeks $270,779.84 for Chase's refusal to make payments of $46,388.00 and $224,391.84 under the second letter. Both parties agreed to a trial before a United States Magistrate.

After trial, the magistrate dismissed the complaint. He held that with respect to each of the three payments Chase refused to make, Marino had not complied with the requirements for payment in the letter. The magistrate rendered a comprehensive opinion discussing in detail the various respects in which he found that Marino had not complied, and made findings of fact and conclusions of law. Marino has appealed from the judgment dismissing the complaint, and Chase has cross-appealed from the magistrate's resolution of one subsidiary issue against Chase.

## II.

"[T]he essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter." *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970); *accord Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 805–06 (4th Cir. 1975); *Anglo-South American Trust Co. v. Uhe*, 261 N.Y. 150, 156–57, 184 N.E. 741, 743 (1933); *Eximetals Corp. v. Guimaraes, S.A.*, 73 A.D.2d 526, 422 N.Y.S.2d 684 (1st Dep't 1979), *aff'd*, 51 N.Y.2d 865, 414 N.E.2d 399, 433 N.Y.S.2d 1019 (1980); H. HARFIELD, BANK CREDITS & ACCEPTANCES 73 (5th ed. 1974).

The *Courtaulds* case illustrates the operation of the rule. There a bank was held properly to have refused payment under a letter of credit because, although the letter required that the draft be accompanied by an invoice stating that it covered "100% acrylic yarn," the invoice stated only that

the goods were "Imported Acrylic Yarn." 528 F.2d at 803.

The rule of strict compliance reflects the fact that a letter of credit is a contract between the bank and the beneficiary of the letter that is separate and distinct from the commercial contract between the beneficiary (usually the seller) and the bank's customer (usually the buyer). The letter of credit is not tied to or dependent upon the underlying commercial transaction. *Venizelos*, 425 F.2d at 464–65; *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 259, 360 N.E.2d 943, 948, 392 N.Y.S.2d 265, 270 (1976); *Maurice O'Meara Co. v. National Park Bank*, 239 N.Y. 386, 395, 146 N.E. 636, 639 (1925). In determining whether to pay, the bank looks solely at the letter and the documentation the beneficiary presents, to determine whether the documentation meets the requirements in the letter.

It is the complete separation between the underlying commercial transaction and the letter of credit that gives the letter its utility in financing transactions. The parties to the commercial contract bring in a third party—the bank—to finance the transaction for them. The bank's sole function is the financing; it is not concerned with or involved in the commercial transaction. This restriction simplifies the bank's role and enables it to act quickly and surely. Because the bank is not involved in the commercial transaction, however, all its rights and duties are set out in and defined by the letter of credit. The bank is not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade.

The corollary to the rule of strict compliance is that the requirements in letters of credit must be explicit, *United States v. Sun Bank*, 609 F.2d 832, 833 (5th Cir. 1980) (per curiam), and that all ambiguities are construed against the bank. *Venizelos*, 425 F.2d at 466. Since the beneficiary must comply strictly with the requirements of the letter, it must know precisely and unequivocally what those requirements are.

Relying on statements such as that in *Venizelos*, 425 F.2d at 465–66, that "[t]he same general principles which apply to other contracts in writing govern letters of credit," Marino in effect urges us to ignore its deviations from the specific requirements in the letters of credit because there has been substantial compliance with those requirements. We decline to do so. The statements upon which Marino relies were made mainly in resolving questions involving the construction of letters of credit and did not relate to the rule of strict compliance. As we have noted, that rule reflects the practicalities and needs of the commercial and financial community. It serves the important purpose of facilitating the use of letters of credit as a method of financing business transactions. We see no reason to depart from the special rules that have been developed for letters of credit merely because those documents also are contracts governed in other respects by the general law of contracts.

### III.

Chase refused to pay three different drafts on the two letters that Marino presented. Since each refusal was made for different reasons, we discuss each claim separately. In determining whether Chase's refusal to pay was justified, we are guided by and apply the general principles governing letters of credit just summarized.

### A. *The $99,000 Claim.*

The first claim was for $99,083.80. It was made under the 60 percent portion of the first letter of credit, i.e., Marino sought payment from Chase after the goods had been received in Saudi Arabia.

To obtain payment Marino was required to submit a certificate that the goods had been inspected prior to shipment and a certificate that the goods had been received. The letters specified precisely what these certificates were required to state. As extended, the letter of credit expired on Monday, December 1, 1980. This meant that to

obtain payment Marino was required to submit by that date certificates that conformed to the requirements in the letter.

1. Marino submitted the inspection certificates on October 15, 1980. On October 17, a Chase employee prepared a discrepancy sheet covering the certificates, which noted various respects in which they did not comply with the requirements in the letter. One of the defects noted was that the certificates did not include copies of the invoices for the shipped goods. The discrepancy sheet contains handwritten comments based upon phone conversations with Marino. The record does not show when these comments were written or which of the deficiencies Chase called to Marino's attention.

On December 2, 1980, the day after the letter had expired, Chase returned the inspection certificates to Marino because the bank was "not able to utilize" them. An accompanying memorandum stated that Chase had "contacted Miss Cinthya [apparently a Marino employee] on the phone several times." It requested Marino: "Please complete requirement of L/C and send documents to us complete." On December 8, Marino resubmitted the inspection certificates to Chase.

2. The letter of credit required the certificates of receipt to be "signed by [a] Midica [sic] [Mdica was the joint venture in Saudi Arabia] representative confirming the arrival of the material on job site Kassim." An amendment to the letter of credit provided that in lieu of a Mdica signature, the notarized signature of the freight forwarder, Zuest & Bachmeier Ag., would be accepted. Berliner Bank had sent to Chase three signature samples of Mdica representatives acceptable to it. Chase never told Marino that only those three signatures would be acceptable or that other signatures would be acceptable if they identified the signer as a Mdica representative (as a Chase representative testified at trial).

On Wednesday, November 26, 1980, a Marino representative, Mr. DeWeil, delivered the certificates of receipt to Pacifico Bautista in Chase's Letter of Credit Department. According to the magistrate, "Mr.

Bautista refused to accept the certificates of receipt because they did not contain an authorized signature. . . . In order to rectify the absence of an authorized signature, Mr. Bautista told Mr. DeWeil to have the certificates of receipt countersigned by an officer of the international freight forwarding company, Zuat Bachmeier." Mr. DeWeil had the certificates countersigned about 5 p. m., that day, but because it was then too late to return them to the bank, he took the certificates to Marino's office on Long Island.

Mr. Pagano, Marino's vice president in charge of exporting, testified that on Monday, December 1 (the date on which the letter expired), he told Mr. Bautista on the telephone that he had six countersigned certificates of receipt and asked Mr. Bautista when he should bring them in. According to Mr. Pagano, Mr. Bautista "decided that I could send them the following day and hopefully that we would get paid as soon as possible." On cross-examination Mr. Pagano stated that the expiration date of the letter had not been mentioned. Mr. Pagano mailed the certificates of receipt the following day (December 2).

On December 8, Chase informed Marino that it would not make payment because proper certificates had not been timely presented. On December 10 and 12, Chase, with Marino's approval, cabled the Berliner Bank, stated that payment had not been made "due to late presentation" and asked, "May we pay[?]" Berliner Bank cabled back "Do not pay . . . as presented too late." Berliner Bank also rejected a third cabled request from Chase for permission to pay.

3. The magistrate held that Marino had not made a timely presentation of the necessary documents and that Chase had not waived the requirement of timely presentation. He apparently accepted Chase's evidence that bringing documents to the bank and taking them back to have them countersigned, as happened on November 26, "is not a presentation of documents." The magistrate stated that documentary evidence showed that "a full set of documents

was not received by Chase until December 8, 1980—eight days after the expiration of the letter of credit on November 30, 1980" and that "[i]n the face of such documentary proof, it is unrealistic to give credence to plaintiff's assertion that there was a timely presentation of conforming documents."

In holding that Chase had not waived the timely presentation requirement, the magistrate pointed to Pagano's admission that neither in his telephone conversation of December 1, 1980, with Mr. Bautista nor in a subsequent meeting with Ms. Soula Stephanides of Chase, at which Marino contended Chase also had waived timely presentation, was it mentioned that the letter had expired. The magistrate further ruled that Chase's cabled requests to the Berliner Bank to make late payment were not waivers but merely were "a courtesy to plaintiff."

4. As we have noted, an important corollary of the strict compliance rule is that the letter of credit must specify precisely and clearly the requirements for payment and that ambiguities in the letter are to be resolved against the bank. Nothing in the letter in this case indicated that the requirement that the certificates of receipt be "signed by [a] Mdica representative" could be satisfied only if one of the three acceptable signatures that Berliner Bank had submitted to Chase was affixed. If that was a condition of payment, Chase was required so to inform Marino. *Sun Bank*, 609 F.2d at 833; 34 N.Y.Jur. *Letters of Credit* § 13 at 431 (1964). Similarly, if Chase would accept signatures of other Mdica representatives provided they were expressly identified as such, as Chase's representative testified at trial, Chase also was required to inform Marino of that condition of payment.

The magistrate did not determine whether the signature on the certificates was that of a Mdica representative. On the remand that we order, the magistrate should determine that fact. If the answer is affirmative, Marino made a timely presentation of the certificates of receipt (on November 26) that complied with the requirements in the letter.

Even if Marino had not made a timely presentation on November 26, there is the question whether Chase waived the time limit when, according to Mr. Pagano, Mr. Bautista, on December 1, 1980, authorized Mr. Pagano to submit the documents after that date. The fact that neither Pagano nor Bautista referred to the expiration date of the bill in that conversation is not necessarily dispositive of the question, although it is significant. The magistrate did not determine whether Mr. Bautista had authority to make such a commitment. It would seem, however, that Mr. Bautista had at least apparent authority to do so, upon which Marino's representative was justified in relying.

5. If Marino made a timely presentation of proper certificates of receipt or if Chase waived the time limit, Marino still was not entitled to payment unless it also timely presented certificates of inspection. As noted, Marino supplied those certificates to Chase on October 15, well in advance of the expiration date of the letter.

Chase's initial inspection of those certificates revealed what Chase believed to be various defects, including the failure to include with the certificates copies of the invoices for the goods. The record does not show, however, whether at that time Chase called these alleged deficiencies to Marino's attention. When Chase finally returned the invoices to Marino for correction on December 2, 1980, the letter had expired.

The letter of credit required Marino to submit

[c]lean inspection certificate, 4 copies, issued by superintendent-company acting in conformity with the regulations of S. G. S. (Societe Generale de Surveillance) stating the full compliance of the quantities and qualities of the goods with the specifications, the commercial invoice and the instructions given by Dietrich Garski Bautechnik KG, Berlin.

This is somewhat ambiguous. It is unclear whether Marino was required to submit a single inspection certificate stating

that the goods complied with the three conditions, or to submit separately the certificates, the invoices and the instructions. In light of the obvious purpose of the requirement to insure that the goods shipped were as ordered, the most reasonable reading of the provision is that Marino was required to submit a single certificate stating that the "quantities and qualities of the goods" complied with "[i] the specifications, [ii] the commercial invoices, and [iii] the instructions given by" Bautechnik (the purchaser). The magistrate did not determine whether the certificates Marino submitted complied with this requirement.

A further problem with respect to the certificates of inspection is presented by the fact that Chase waited a month-and-a-half before returning them to Marino for correction. Under article 8(d) of the Uniform Customs & Practice for Documentary Credits, Chase had "a reasonable time" within which to examine the documentation. *See* N.Y.U.C.C. LAW § 5–112(1)(a) (giving banks three banking days). If Chase had returned the certificates promptly, Marino would have had ample time to correct any deficiencies. By not returning the certificates until after the letter had expired, Chase made it impossible for Marino to correct any deficiencies and still make timely presentation. *Cf. Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1236 (5th Cir. 1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974) (when bank says documents conform, it cannot then deny conformity after expiration). There is a question, therefore, whether Chase is estopped from relying upon defects in the certificates of inspection as a justification for refusing payment.

6. We therefore conclude that we cannot affirm the magistrate's dismissal of the $99,000 claim. The portion of the judgment that dismissed that claim is reversed, and this portion of the case is remanded to the magistrate for further proceedings in accordance with this opinion.

B. *The $46,000 Claim.*

■ Marino's second claim is for $46,388 under the 40 percent provision of the second letter of credit. Under that provision Marino was entitled to payment upon shipment of the goods.

The magistrate upheld Chase's refusal to pay this claim because of four deficiencies he found in the supporting documentation Marino submitted. Since we conclude that one of these deficiencies is fatal to Marino's claim, we need not consider the other three.

Paragraph b) of Chase's confirmation of the letter required Marino to submit to Chase in order to obtain payment under the 40 percent provision

> copy of telex confirmation . . . addressed to Dietrich Garski [one of the principals of Bautechnik] . . . , showing that ½ original clean on board ocean liner bills of lading, 1 legalized commercial invoice, 1 legalized packing list, and 1 legalized certificate of origin have been sent to both: 1) [word apparently crossed out] Bautechnik, Riyadh and 2) custom agent at port of destination.

Legalization apparently is a process by which a document is stamped by the consulate of the country of destination—here Saudi Arabia.

The telex to Dietrich Garski, a copy of which Marino submitted to Chase, did not show that a "legalized" packing list had been sent but referred only to a packing list.

Under the rule of strict compliance, this defect justified Chase in refusing payment. The language is clear and unambiguous. Marino was required to submit a copy of a telex showing that a "legalized" packing list had been sent. It did not do so. " 'There is no room for documents which are almost the same, or which will do just as well.' " H. HARFIELD, BANK CREDITS & ACCEPTANCES 73 (5th ed. 1974) (citation omitted), *quoted in Eximetals*, 73 A.D.2d at 527, 422 N.Y.S.2d at 686.

Marino argues that this requirement was included in the letter in error because the requirement makes no sense and therefore that it should be disregarded. It points out that in addition to submitting a copy of the

telex, it also was required to submit invoices and a certificate of origin, each of which was explicitly required to be legalized by the Saudi consulate, (paragraphs c) and e)), and a packing list which was not required to be legalized (paragraph d)). It argues that paragraph b) merely required the telex to confirm that the documents specified in the other provisions of the letter of credit had been sent, and that since those other provisions did not require a legalized packing list, that requirement in paragraph b) should be ignored.

The different requirements serve different purposes, however. Paragraph b) required that the telex show that a legalized packing list had been sent. Paragraph d) permitted Marino to submit to Chase a copy of the packing list that had not been legalized. This provision did not excuse Marino from stating in the telex sent to Dietrich Garski that a legalized packing list had been sent to Saudi Arabia.

We must assume that Marino complied with the requirements in the letter that it submit to Chase legalized invoices and certificates of origin. Marino gives no convincing reason why it could not also have legalized the packing list. Although Marino tells us that the Saudi consulate did not legalize packing lists, it did not tell Chase when it submitted the documents that this was the reason the packing list had not been legalized.

The portion of the judgment dismissing the $46,000 claim is affirmed.

C. *The $224,000 Claim.*

█ The third claim is for $224,391.84. It arises under the 60 percent portion of the second letter of credit.

The magistrate found that there were several defects in the documentation that justified Chase in refusing to pay. As was the case with the $46,000 claim, we uphold the magistrate on one of those grounds and therefore need not discuss the others.

The letter required Marino to present [c]ertificate of receipt showing that freight charges are prepaid till [sic] the job site Kassim signed by Mdica representative.

The certificates of receipt presented stated nothing about prepayment of freight charges. Each receipt, however, contained in a box at the top the following: "ACCOUNT: CASH." The word "CASH" was crossed out. DeWeil, an official of a freight forwarding company who represented Marino in this transaction and presented the documentation to Chase, stated that the crossing-out of the word "CASH" "means that ... [f]reight charges are prepaid."

The rule of strict compliance entitled Chase to receipts showing that the freight charges had been prepaid to Kassim. On their face, the receipts did not so show. Chase was therefore justified in rejecting the receipts as not complying with the letter. As Chase points out, the striking out of the word "CASH," which left the word "ACCOUNT" standing, might reflect exactly the opposite situation from that which Marino urges, i.e., "if delivery was made on account, the freight charges ha[d] not been paid."

When the receipts were presented, Chase's function was to check them to see whether they conformed to the letter. Chase was not required further to check other documents Marino had presented earlier—the bills of lading and the invoices—which according to Marino showed that the freight charges had been prepaid. *Courtaulds*, 528 F.2d at 806; *see also Flagship Cruises, Ltd. v. New England Merchants National Bank*, 569 F.2d 699, 704 (1st Cir. 1978); *O'Meara*, 239 N.Y. at 398, 146 N.E. at 640; *Laudisi v. American Exchange National Bank*, 239 N.Y. 234, 239–40, 146 N.E. 347, 348 (1924) (banks may sometimes be required to look at accompanying documents).

This court on occasion has read particular trade customs into letters of credit. The leading case that did so, however, involved a custom of commercial banks of accepting, in lieu of a missing bill of lading, a guaranty of a leading New York bank. *Dixon, Irmaos & Cia. v. Chase National Bank*, 144 F.2d 759, 761–62 (2d Cir. 1944). The custom

was "a general and uniform custom among New York banks, exporters and importers," and it was established by the testimony of "[n]umerous witnesses, experts in the fields of banking and of commerce." *Id.* The court pointed out that the custom was "absolutely essential to the expeditious doing of business in overseas transactions in these days when one part of the bill of lading goes by air and another by water." *Id.* at 762.

In the present case there is no evidence of any custom among banks (or elsewhere) to treat striking out of the word "CASH" on the receipt as indicating prepayment of freight. Mr. DeWeil merely stated his opinion that that was the effect of such action. Moreover, unlike the situation in *Dixon,* there is no reason why it would interfere with the effective use of letters of credit to finance international transactions if the receipts are required explicitly to state that freight charges had been prepaid. It would be a relatively simple matter to include such a statement on the receipt. Chase cannot be charged with improper failure to pay under the letter because it followed the precise terms of the letter instead of accepting the opinion of a freight forwarder concerning the significance of striking out the word "CASH" on the receipts. "The usage which controls letter of credit transactions is banking usage, not commercial usage." N.Y.U.C.C. Law § 5–109 Practice Commentary.

## CONCLUSION

The judgment of the United States District Court for the Eastern District of New York is affirmed in part and reversed in part, and the case is remanded to it for further proceedings before the magistrate on the $99,000 claim in accordance with this opinion.