**TRIFINERY, A Texas Co–Partnership, Petcor Services, Inc. and Petroserve, Ltd., as co-partners, Plaintiffs,**

v.

**BANQUE PARIBAS, Defendant and Third–Party Plaintiff,**

v.

**VITOL, S.A., INC., Third–Party Defendant.**

No. 90 Civ. 0673 (JES).

United States District Court, S.D. New York.

May 2, 1991.

---

Walker, Walker & Kapiloff, P.C. (Arnold Y. Kapiloff, Daniel S. Wohlfarth, of counsel), New York City, for plaintiffs.

Boulanger, Finley & Hicks (J. Portis Hicks, of counsel), New York City, for defendant and third-party plaintiff.

Coudert Brothers (Darrell Prescott, of counsel), New York City, for third-party defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs Trifinery, Petcor Services, Inc., and Petroserve Ltd. (collectively "Trifinery") bring this action against Banque Paribas ("Paribas" or "the Bank") alleging that Paribas wrongfully refused payment on a letter of credit opened by Vitol, S.A., Inc. ("Vitol") in favor of Trifinery. Presently pending before the Court is Paribas' motion for summary judgment.[1] For the reasons set forth below, the motion is denied.

## BACKGROUND

### The Underlying Transaction

This action arises out of a transaction between Trifinery and Vitol involving the sale and processing of oil, which was structured as follows: (1) Vitol agreed to sell to Trifinery 437,000 barrels of 100% Syrian straight run fuel oil of normal export quality shipped on a vessel named the "Bulk Ravenna;" (2) Trifinery was to process that crude oil into component parts known as vacuum gas oil ("VGO"), vacuum tower bottoms ("VTB") and distillate, and was to sell those components back to Vitol;[2] and (3) Trifinery was to then repurchase the VTB from Vitol for sale to others as asphalt. *See* Affidavit of Sanford Brass ("Brass Aff.") at ¶¶ 18–22 & Exs. B–C; Affidavit of Neil E. Kelley ("Kelley Aff.") at ¶¶ 3, 6, 8, 10–14. However, although Trifinery agreed to sell the VTB to Vitol after processing, it was not contemplated that the VTB would ever actually leave Trifinery's tanks, because, as noted above, the VTB would ultimately be sold back to Trifinery. *See* Brass Aff. at ¶ 81; Kelley Aff. at ¶¶ 10, 14.

The agreement also provided that the parties would secure their respective obligations by opening letters of credit in favor of the other contracting party. Thus, Trifinery caused Bank Indosuez to issue a letter of credit in the amount of $3,175,800.00 to secure its payment obligations to Vitol, whereas in turn Vitol caused Banque Paribas to open the letter of credit at issue in this litigation in the amount of $3,504,447.90 to secure its obligations to Trifinery. *See* Brass Aff. at ¶¶ 21, 33–34, 37 & Exs. I, L; Kelley Aff. at ¶¶ 7, 9.

Subsequently, when disputes arose regarding the quality of the crude oil aboard the "Bulk Ravenna," *see* Brass Aff. at ¶¶ 23–26, 41–45, Trifinery and Vitol engaged in extensive negotiations which led to an agreement to reduce the amount of crude oil that Trifinery was obliged to purchase and process and a reduction in the percentages of VGO to VTB expected to be yielded from the crude oil delivered to Trifinery. *See* Brass Aff. at ¶¶ 25–32 & Exs. G–H. However, when Trifinery concluded that the VTB that it could produce from the crude oil delivered by Vitol could not be sold profitably for asphalt, it notified Vitol that it would not repurchase the VTB from Vitol as agreed, but instead would attempt to market it for Vitol's account. *See* Brass Aff. at ¶¶ 41–43. Vitol did not consent to Trifinery's proposed sale for Vitol's account, but decided to take no action until the VTB was sold. *See id.* at ¶¶ 44–46. Toward that end, both parties extended their letters of credit to December 15, 1989. *See id.* at ¶¶ 47–48.

---

**1.** Paribas also moved for summary judgment on certain counterclaims it asserted against Trifinery arising out of Trifinery's failure to comply with the terms of an unrelated letter of credit agreement between Trifinery and Paribas. That motion was granted.

**2.** When Syrian straight run fuel oil is refined, it yields "light ends," referred to as VGO and distillate, and "bottoms" referred to as VTB. The "light ends" trade at significantly higher prices than the "bottoms." *See* Brass Aff. at 7 n. 1.

No agreement was reached. Although Trifinery offered to pay part of the amount due for the disputed VTB and sent a partial payment in December 1989, Vitol continued to insist that Trifinery pay the entire amount due for the VTB. *See id.* at ¶¶ 53–57. When Trifinery failed to comply with Vitol's demand that that sum be paid by wire transfer, Vitol drew upon and was paid $1,099,834.13 on the Bank Indosuez letter of credit, a sum that did not take into account or recognize Trifinery's rejection of its obligation to repurchase the VTB from Vitol. *See* Kelley Aff. at ¶¶ 15, 17–26. In response, Trifinery unsuccessfully sought to draw down upon the Banque Paribas letter of credit based upon its contention that Vitol was obligated to pay it for the VTB it agreed to purchase from Trifinery but that Trifinery was not obliged to repurchase that VTB from Vitol.

*The Banque Paribas Letter of Credit*

The letter of credit issued by Banque Paribas in favor of Trifinery provided as follows:

> We hereby open our irrevocable standby letter of credit No. 719430/AR in favor of Trifinery, Houston, Texas by order and for account of Vitol S.A., Inc., Stamford, Ct available at sight for an approximate amount of 3,504,447.90 U.S. Dollars against:
>
> 1. Copy(ies) of a signed commercial invoice(s) covering approximately 99,540 barrels of vacuum gasoil at USD 18.585 per barrel and/or approximately 125,610 barrels of vacuum tower bottoms at USD 11.25 per barrel and/or approximately 11,850 barrels of distillate at USD 20.37 per barrel F.O.B. basis Corpus Christi, Texas delivered during September and/or October 1989.
>
> 2. Copy of document, purportedly issued or cosigned by the independent inspector for verification of quantity per shore tank down gauge and quality. Shore tank composite quality must meet

the following contractual specifications: [specifications for VGO omitted]

> The specifications for the distillate and vacuum tower bottoms should be consistent with the production of straight run Syrian fuel oil.
>
> 3. Copies of an original clean on board ocean bill of lading issued or endorsed to the order of Vitol S.A., Inc. and or copies of [independent inspectors report] indicating shipper as "Trifinery" and cosignee as "Vitol S.A., Inc."
>
> 4. A statement purportedly signed by an authorized representative of Trifinery stating that the invoiced product resulted 100 percent from the processing of the straight run Syrian fuel oil received by Trifinery from the vessel "Bulk Ravenna" supplied by Vitol and that the product has been delivered and that although the invoice(s) presented under this letter of credit was (were) due according to contract terms, Vitol S.A., Inc. failed to make payment and payment remains outstanding at the time of drawing.

*See* Affidavit of Anthony Reardon ("Reardon Aff.") at Ex. 1.[3]

On the morning of December 15, 1989, the date that the letter of credit was due to expire, Trifinery presented documents to Paribas in support of a request for payment under that letter of credit in the amount of $1,413,891 for the sale of VTB to Vitol. *See* Reardon Aff. at ¶ 4 & Ex. 2. The Bank determined that these documents did not comply with the terms of the letter of credit for the following reasons: (1) the invoice presented was an original whereas the letter of credit required a copy; (2) the invoice misidentified Trifinery's place of business; (3) the two certificates of weight submitted were not identified as independent inspectors' reports and could not be related to the September/October delivery date; and (4) the third document required by the letter of credit, an independent inspector's report or bill of lading identifying Trifinery as the "shipper" and Vitol as the

---

**3.** The letter of credit was amended twice. On or about October 4, 1989, the bracketed language in paragraph 3 reading "independent inspector's report" was added to replace the words "pipeline meter ticket." *See* Reardon Aff. at Ex. 1, at 4. And on November 15, 1989, the letter of credit was amended to extend the expiration date to December 15, 1989. *See id.* at Ex. 1, at 5.

"cosignee," was missing. *See id.* at ¶ 5; Affidavit of John Tomaszewski ("Tomaszewski Aff.") at ¶¶ 6–12 [4]. Anthony Reardon of Banque Paribas communicated the Bank's decision to John Tomaszewski of Trifinery by telephone before noon. *See* Reardon Aff. at ¶ 5.

At approximately 1:30 p.m. the same day, Trifinery presented a new set of documents intended to correct the defects of its first presentation. *See id.* at ¶ 6 & Ex. 3. This request sought payment of $1,267,083.00 for 112,629.60 barrels of VTB. *See id.* at ¶ 6. However, this presentment was also rejected by Paribas because the statement on the independent inspector's report that the VTB was "delivered into Trifinery's tanks in September and October, 1989" contradicted both the terms of the letter of credit that the oil be delivered to Vitol and also contradicted the statement in the invoice that such delivery had taken place. *See id.* at ¶ 7(a). Moreover, the independent inspector's report failed to verify the quantity of VTB delivered "per shore tank down gauge," as required by the letter of credit. *See id.* at ¶ 7(b). Finally, the third document was still missing. *See id.* at ¶ 7(c). As a consequence, Reardon telephoned Tomaszewski at 3:00 p.m. and advised that these documents still did not comply with the terms of the letter of credit. Tomaszewski stated that the independent inspector would send additional documents to Paribas, but none were ever received. *See id.* at ¶ 8. Accordingly, Paribas sent Trifinery a telex confirming the rejection of their draw upon the letter of credit. *See id.* at Ex. 5.

Trifinery's version of these events is quite different. Specifically, Tomaszewski states in his affidavit that when Reardon first raised his concern about the independent inspector's report's failure to refer to the oil delivered in September and October, he explained the nature of the transaction to him, which did not contemplate physical transfer of the VTB, and that Reardon himself suggested the language which Paribas now claims is inconsistent, *i.e.* that the oil "was delivered into Trifinery's tanks." *See* Tomaszewski Aff. at ¶¶ 9, 22. Moreover, he states that Reardon expressly agreed that the letter of credit did not require that the VTB, as opposed to the VGO, be measured "per shore tank down gauge." *See id.* at ¶¶ 11, 22. Tomaszewski also asserted that Reardon did not mention these items in their second telephone conversation. *See id.* at ¶ 19.[5]

Reardon denies this contention and has submitted an affidavit and contemporaneous notes which support his claims that he did not waive any requirements of the letter of credit. Moreover, he asserts that he had no authority to waive the requirements of any letter of credit and that Paribas' normal practice is not to waive strict compliance unless the bank customer who opened the letter of credit consents. *See* Reply Affidavit of Anthony Reardon ("Reardon Reply Aff.") at ¶¶ 4–6, 8–9.

## DISCUSSION

▮ The issue facing this Court is whether Trifinery has raised, as it must under Fed.R.Civ.P. 56, a genuine issue of material fact regarding (a) whether the documents it presented strictly complied with the terms of the letter of credit; and (b) if they did not, whether Paribas waived any of those defects.[6] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49,

---

**4.** The Tomaszewski affidavit does not indicate that Reardon mentioned the absence of the third document during their first telephone conversation.

**5.** Trifinery has also submitted a letter written by Sanford Brass to Banque Paribas, which states that Reardon specified that the language regarding delivery into Trifinery's tanks be added to the independent inspector's report. *See* Brass Aff. at Ex. BB. However, that letter makes no mention of the need to verify the quantity of VTB "per shore tank down gauge." *See id.*

**6.** Third-party defendant Vitol also moves for summary judgment on the ground that Trifinery has already been paid for the VTB because it has received a credit toward its repurchase of that VTB from Vitol, an argument which assumes that Trifinery was obliged to repurchase the VTB in the first place. However, there are sharply disputed issues of fact as to whether Trifinery was in fact obliged to repurchase the VTB from Vitol. The motion for summary judgment must therefore be denied.

106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ It is well-settled that the terms of a letter of credit must be strictly complied with by the party entitled to draw upon it and that the documents submitted must conform to the requirements set forth in the letter of credit. *See, e.g., Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 683 (2d Cir.1983); *Marino Indus. Corp. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 114 (2d Cir.1982); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir.1970). However, the Second Circuit has stated that some variations in a document presented might be so insignificant as not to relieve the issuing bank of its obligation to pay. *See Beyene v. Irving Trust Co.*, 762 F.2d 4, 6 (2d Cir.1985). This would include a situation where a word in a document is unmistakably clear despite an obvious typographical error, *cf. id.* at 6, or where the customer provides only five copies of identical documents instead of six copies. *Cf. Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1541 (S.D.N.Y.1985), *aff'd on other grounds*, 808 F.2d 209 (2d Cir.1986).

■ However, the Court need not reach the issue of whether the defects relied on by Paribas were so insignificant as to not relieve Paribas of its obligation to pay under the letters of credit. Trifinery has raised a genuine issue of material fact with respect to the issue of whether Paribas waived those alleged defects. An issuing bank may waive the requirement of strict compliance with the terms of a letter of credit even in the absence of consent from its customer. *See Voest-Alpine, supra*, 707 F.2d at 684–85; *Marino Indus., supra*,

686 F.2d at 117. Here, Trifinery has put forth an affidavit asserting that after Reardon was told of the nature of the underlying transaction he dictated the language which Paribas claims was inconsistent with the terms of the letter and waived the requirement that the VTB be measured "per shore tank down gauge." *See* Tomaszewski Aff. at ¶¶ 9, 11, 19, 22. Although Reardon denies this, *see* Reardon Reply Aff. at ¶¶ 3, 5, the conflicting affidavits clearly present credibility questions to be resolved at trial. Moreover, Reardon's assertions that he lacked the authority to waive these requirements or that Paribas' policy was not to waive any requirements of a letter of credit without the consent of its customer, *see id.* at ¶ 6 & n. *, also present fact questions regarding the scope of Reardon's apparent authority and whether the limitations on that authority were known to Trifinery.[7] *Cf. Marino Indus., supra*, 686 F.2d at 117.

## CONCLUSION

Accordingly, Banque Paribas' motion for summary judgment is denied. A Pre-Trial Conference shall be held on June 14, 1991 at 10:30 AM in Courtroom 129.

It is SO ORDERED.

---

**7.** Nor does the absence of another "independent inspector's report" compel summary judgment in Paribas' favor. Given the circumstance that the shipper/cosignee language was contained in the independent inspector's report which was submitted, the failure to supply the bank with an extra document from the independent inspector including that language may well constitute the kind of insignificant variation which this Circuit has regarded as insufficient to relieve Paribas of its obligation to pay, especially since "there is no possibility that the documents could mislead the paying bank to its detriment." *Bank of Cochin, supra*, 612 F.Supp. at 1541 (quoting *Flagship Cruises, Ltd. v. New England Merchants Nat'l Bank*, 569 F.2d 699, 705 (1st Cir.1978)).