**MUTUAL EXPORT CORP., Plaintiff,**

v.

**WESTPAC BANKING CORP.,
Defendant.**

No. 90 Civ. 1479 (WK).

United States District Court,
S.D. New York.

April 21, 1992.

See also 742 F.Supp. 161.

Daniel A. Ross, Sharfman, Shanman, Poret & Siviglia, P.C., New York City, for plaintiff.

Edwin G. Shallert, Andrea L. Labov, Debevoise & Plimpton, New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, District Judge.

Plaintiff Mutual Export Corp. comes before us with a tale of woe from Downunder, seeking reformation of a letter of credit that terminated too early as a result of blunder. The parties, agreeing that the facts are for the most part undisputed, have cross moved for summary judgment. For the reasons that follow, plaintiff's motion is granted and defendant's denied.

### FACTS [1]

In June, 1985, Reefer Express Lines Pty. Ltd. ("Reefer") divided the capital stock of its wholly owned subsidiary Refrigerated Express Lines (A/Asia) Pty. Ltd. ("Refrigerated") into halves, and sold one half to a group (known as Bapopo) that was controlled by Refrigerated's local Australian managers and the other half to a quasi-governmental New Guinea group (known as Bodecas).[2] Defendant knew well before June 1985 that Reefer was seeking to sell Refrigerated, and to whom. During this period, Reefer, Refrigerated, and plaintiff, which is also a wholly owned subsidiary of Reefer, were involved in a series of "back-to-back" charter parties by which Reefer chartered two container ships (the "Ku-

---

1. We draw all reasonable inferences and resolve any ambiguities against plaintiff, the party whose motion we grant.

2. After the sale, Refrigerated was eventually renamed New Guinea Express Lines (A/Asia) Pty. Ltd. To avoid confusion, we shall refer to it as "Refrigerated" throughout.

mul" and "Lakatoi") from their Japanese owners and in turn chartered them to plaintiff, who chartered them to Refrigerated, who operated the ships. Defendant knew that the charter parties extended well past June 30, 1986, and that the back-to-back arrangement was to remain in place after completion of the sale. Def. 3(g) at ¶¶ 3–4, Pl. 3(g) at ¶¶ 1–3.

A necessary element of the sale of Refrigerated was its procurement of an irrevocable standby letter of credit for the benefit of plaintiff for $500,000 to secure approximately one month's payment on the charter parties of the two ships. Pl. 3(g) and Def. Response to Pl. 3(g) at ¶ 10. Moreover, defendant knew that the letter of credit was intended to run for the term of the charter parties, and why. For example, Roy Roach, Manager of defendant's George Street branch in Sydney, who had signed the letter of credit on defendant's behalf, testified that since he had signed the letter of credit knowing that it was intended "in support of charter fees," he had been surprised when he subsequently learned that its term was not coextensive with the charter parties. Roach Dep. at 164. Roach also wrote in an internal memorandum to defendant's regional manager that the "[g]uarantee is essential for charter of [Refrigerated's] vessels, without guarantee company would be unable to charter ships." Pl.Dep.Exh. 3 at 92, 94.

To that end, sometime on or prior to June, 26, 1985, defendant was requested to issue such a letter of credit, and Reefer forwarded to them a draft version of the letter they desired. Def. 3(g) at ¶¶ 5–6. That draft included the following duration term: "This letter of credit expires [45 days after the later of the last possible day on which Kumul Express or Lakatoi Express charter may terminate]." Def. Resp. to Pl. 3(g) at ¶ 9 (brackets in original). Refrigerated had made the need for the letter known to defendant before June 26,

and why it was necessary. However, the request for the letter was apparently first formally made in the course of a June 26 meeting between branch manager Roach and another bank employee on the one hand, and James Horn, vice-president of both plaintiff and Reefer, and Andrew Consentino, counsel representing both plaintiff and Reefer at the closing of the sale of Refrigerated, on the other. Consentino and Horn informed defendant at the meeting that the letter of credit was required on or before June 28, when the half of the closing involving the Bapopo group was to take place. They were in turn informed that because of administrative necessities, the actual letter of credit could not be issued by that time.[3] Def.Resp. to Pl. 3(g) at ¶ 12, Pl.Resp. to Def. 3(g) at ¶ 5.

Accordingly, no actual letter of credit being available for the June 28 closing of the · sale of half of Refrigerated to the Bapopo group, a letter signed by Roy Roach on behalf of defendant was that day delivered to Horn and Consentino, respectively an officer of and counsel to Reefer (each of whom performed the same function for plaintiff). This letter ("June 28 letter"), addressed to Reefer, read as follows:

> The Bank has *approved* at the request of Refrigerated Express Lines (A/Asia) Pty Ltd, the establishment of an Irrevocable Credit for USD $500,000 in favour of Mutual Export Corporation.
>
> The Bank hereby *undertakes* to issue the credit in the *draft form provided by your company, or as mutually agreed upon* between your company and the Bank.

Labov Aff.Exh. I (emphasis added).

While defendant contends that Roach did not have the authority to approve the issuance of the requested letter of credit—which approval had apparently been given by defendant's regional manager that same day—it conceded at oral argument that he

---

**3.** Consentino is the only of the participants in that June 26 meeting who recalls it. Because neither Roach nor Horn dispute that it took place, but simply cannot recall if there was such a meeting, defendant's speculation as to the reliability of Consentino's memory on this point

does not raise even an inference that the described meeting did not take place. We note, in so finding, that the June 28 letter is a logical postscript to the meeting, and there is no other evidence in the record that explains its rushed delivery to the June 28 closing.

did have the authority to write and deliver the June 28 letter.

That same day Roach sent a report to defendant's regional manager requesting approval of the letter of credit, along with a modified version of the draft letter of credit plaintiff had provided to defendant. However, unbeknownst to plaintiff, the duration clause setting the letter of credit's expiration at "[45 days after the later of the last possible day on which Kumul Express or Lakatoi Express charter may terminate]" had been crossed out and a termination date of "June 30, 1986" inscribed by hand above it.[4] The latter termination date was then utilized in the letter of credit signed by Roach and issued on July 5, 1985. Labov Aff.Exhs. G, J. One Gary Pagotto, an assistant to Roach, made the handwritten change to plaintiff's draft version, but when deposed in June 1991, was unable to recall who, if anyone, instructed him to do so, or why. Pagotto Dep. at p. 9. It is clear, however, that Roach did not order the change, since until he saw the June 30, 1986 termination date sometime in December 1988, he "assumed that the standby letter of credit was still current." Roach Dep. at 164.

The letter of credit is otherwise in all respects identical to the draft version supplied by plaintiff, including: addressing it to plaintiff care of Reefer; writing out the sum in capitals and small letters ("FIVE HUNDRED THOUSAND AND no/100 United States dollars"); underlining it's number and date of issuance in conformance with the underlined blanks in the draft that signalled where those terms should be inserted; and reproducing the phrase *"(specify "KUMUL EXPRESS" OR "LAKATOI EXPRESS")"* exactly as it appeared in the draft, complete with parentheses, underlining, and capitalization of

and quote marks around the ships' names. *Compare* Labov Aff.Exh. G *with* Labov Aff.Exh. J. Even the letter of credit's closing—"Very truly yours"—is drawn from plaintiff's draft version, and stands out in contrast with the "Yours faithfully" closing that Roach uniformly used in the others of his letters in the record. *Compare* Labov Aff.Exh. G *with* Labov Aff. Exhs. I, P, S *and* Pl.Dep.Exh. 7.

Defendant telexed a copy of the letter of credit to plaintiff, which received it by July 12, 1985; plaintiff also received a copy of the original on or before August 5, 1985. Def. 3(g) at ¶ 16. Consentino read the letter of credit and questioned the new termination date in a July 11 memorandum marked "re: Reefer sale of Refrigerated" addressed to Virginia Pearce, Refrigerated's Australian counsel, pointing out that:

> because the Letter of Credit must be in force without interruption until some time after the charters have terminated, either the Letter of Credit must be for a longer period or ... the Addendum [to the charter party] must be revised to require renewals not less than forty-five days prior to each expiration.

Labov Aff.Exh. M (at p. 149).

Pearce, in a July 12 fax to Consentino responded "I understand that a final signed form of the Letter of Credit complete with missing language has been forwarded to [Refrigerated] by Westpac. Please let me know if any language remains missing." Def.Dep.Exh. 10 (at p. 137).[5] So far as we are aware there were no further communications with respect to this termination date between Refrigerated and Reefer or plaintiff, or between either of those entities and defendant. Consentino discussed the letter of credit with Horn and Dan Valvano, another officer of both plaintiff and

---

**4.** Additionally, "Irving Trust Co." was crossed out in three places and "Westpac Banking Corp." substituted.

**5.** She also faxed a revised page two of the addendum to the charter party for the ships, adding the language here underlined:

> The Letter of Credit will be continuously in force for a period to expire not earlier than 45 days after the later of the last possible day on

which the Kumul Charter and the Lakatoi Charter may terminate. And in the event that the Letter of Credit is provided by way of renewed letters of credit for specified terms of this addendum, then each L.C. shall be renewed not less than forty five (45) days before the expiry of any term of any particular Letter of Credit to ensure the continuation of the terms as herein before appearing.

Def.Dep.Exh. 10 at p. 141.

Reefer but neither of them recalls reading it at that time, or in fact anything else about it other than that there was a problem with it requiring that the original be returned to Australia. Def. 3(g) at ¶ 19, Valvano Dep. at pp. 139, 141–44, 149–50, Horn Dep. at pp. 127–28.

Thus by mid-July 1985, though plaintiff's counsel knew the date had been changed and took some limited steps to correct it, plaintiff's officers were unaware of the change in the termination date. While plaintiff never affirmatively agreed to the June 30, 1986 date, neither did it inform defendant that such termination date was unacceptable. Def.Resp. to Pl. 3(g) at ¶¶ 13, 15. Rather, plaintiff has conceded that it "dropped the ball" and did nothing more to correct the letter of credit's termination date.

Thereafter, until Refrigerated in December 1988 informed plaintiff that it would default on a charter party payment, there was no communication between Reefer or plaintiff and defendant with respect to the letter of credit. Throughout that period, however, both parties and all other involved entities believed and acted as if the letter of credit remained in place.

For example, both Roach and one of his assistants, Stephen Parker, testified at depositions that—up to the day defendant retrieved the misfiled letter of credit after Refrigerated's early December 1988 warning of impending default and discovered the actual termination date—they had at all times believed the letter of credit to have been in effect. *See* Roach Dep. at 128, Parker Dep. at 62. And defendant on at least two occasions wrote Refrigerated announcing that the letter of credit was in place, either for the benefit of plaintiff (in an August 18, 1987 letter signed by Roach) or Reefer ("Reefa," in an undated letter signed by Parker, sent in September 1988).

Specifically, the August 18, 1987 letter stated:

We are pleased to confirm the Bank's approval to the following facilities: —

.    .    .    .    .

—Continuance of Bank Guarantee in favour of Mutual Export Corp. USD 500,000 (five hundred thousand dollars).

Pl.Dep.Exh. 7.

This letter was signed by officers of Refrigerated in addition to Roach. The letter sent in September 1988 stated:

I hereby confirm that the following guarantees are outstanding on behalf of [Refrigerated].

.    .    .    .    .

In addition the Bank has established a stand-by letter of credit guarantee F/-Reefa USD 500,000.

Pl.Dep.Exh. 8.

Other letters of credit listed in the September 1988 communication include an expiration date; the "Reefa" one did not. Defendant also orally confirmed the continuing existence of the letter of credit at different times in 1987 and 1988. Pl. 3(g) and Def. Resp. to Pl. 3(g) at ¶ 25.

Additionally, Roach listed the letter of credit as a "Resultant Facility" in a November 3, 1988 internal communication to the defendant's regional manager recommending further extension of credit facilities to Refrigerated. Pl.Dep.Exh. 3 at 92, 94. Others of defendant's internal records also reflected the existence of the guaranteed letter of credit to either plaintiff or Reefer, and defendant took the potential $500,000 liability into account in its credit arrangements with Refrigerated. Finally, although the parties agree that there was no record of any fees being paid for the letter of credit facility either before or after the June 30, 1986 termination date—there existing no "liability card," which defendant normally uses to record payment of such fees—the August 18, 1987 letter that Refrigerated signed lists a 1.50% per year charge for the letter of credit, and others of defendant's internal documents also reflect this fee arrangement. *See generally* Def. 3(g) and Pl.Resp. to Def. 3(g) at ¶ 22; Def.Resp. to Pl. 3(g) at ¶ 23; Def. Exh. S; Pl.Dep.Exh. 2 at pp. 194, 197–99, 201, 203, 828; Pl.Dep.Exh. 6 at pp. 134, 136, 139.

Refrigerated informed plaintiff of its imminent default on the charter parties sometime in early December, 1988, at which time Valvano, intending to draw down on the letter of credit, retrieved plaintiff's copy of it from the safe deposit box in which it had been stored for more than two years and discovered that it facially had already expired. Plaintiff sought confirmation from defendant that the letter of credit was in fact still in place, but was informed, to the contrary, that it had expired. In response to informal requests and, finally, a formal demand, defendant relied on the express termination date of June 30, 1986 in declining to make any payment on the letter of credit. Def. 3(g) at ¶¶ 26–26, 29. Plaintiff, after these negotiations failed, commenced the action on March 6, 1990.

## DISCUSSION

We agree with the parties that Australian law controls in this case.[6] Plaintiff concedes, and again we agree, that the question of whether or not the June 28 letter constitutes a contract is determinative of the motions before us.

Generally speaking, there are three contractual relationships in any letter of credit situation. In the instant case those contracts are: (1) the contract embodying Reefer's sale of Refrigerated to the Bapopo group, which occasioned the issuance of the letter of credit; (2) the contract between Refrigerated, which requested the letter of credit, and defendant, which issued it; (3) and the letter of credit contract between defendant and plaintiff, respectively its issuer and beneficiary. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.* (2d Cir.1983) 707 F.2d

680, 682; *Tradax Petroleum American, Inc. v. Coral Petroleum, Inc.* (5th Cir.1989) 878 F.2d 830, 832. In the overwhelming majority of letter of credit situations there is no contractual relationship between the entities involved in the third of these contracts other than that evidenced by the letter itself. Accordingly, courts applying standard letter of credit law refer exclusively to, and strictly construe, the letter in dispute, interpreting any error in it against the party responsible for the error.[7] *See Tradax*, 878 F.2d at 832, 834. *See also Westpac Banking Corp. and Another v. South Carolina National Bank* (P.C.1986) 64 A.L.R. 30 and cases cited in Def. Mem. in Support at 17; *Marino Industries Corp. v. Chase Manhattan Bank, N.A.* (2d Cir. 1982) 686 F.2d 112, 115.

Thus unless the June 28 letter is found to be a contract binding defendant to issue to plaintiff the letter of credit in the form of the draft provided, none of the events that occurred or documents that were written in connection with the sale of Refrigerated are relevant to this action except the letter of credit as ultimately issued. In that case, the explicit June 30, 1986 termination date found therein would, as plaintiff has acknowledged, simply extinguish plaintiff's claim.[8] However, if the June 28 letter is such a contract, we would consider other evidence to determine if the resulting letter of credit reflected the terms and conditions agreed upon by the parties, and if they do not, whether or not reformation of the letter of credit is an appropriate remedy. *See Tradax* 878 F.2d at 834.

■ Under Australian contract law, a writing that contains "all the essentials of a valid contract" is "an enforceable agreement." *Cohen and Another v. Mason* (Ct.

---

6. Australian courts often turn to ours in the area of letters of credit.

7. The Uniform Customs and Practice for Documentary Credits (UCP), to which the parties agreed in the letter of credit to be subject, limits the duties of an issuer of a letter of credit to those established in that document, and forbids the beneficiary from benefiting from any other of the contracts involved in the issuance of the letter of credit.

8. Defendant notes that the subject of this litigation is a letter of credit and vigorously argues that letter of credit law should therefore apply. It concedes, however, that the cases it cites do not involve a situation like the one before us, where plaintiff argues that there is in fact a contractual relationship between the parties underlying and creating the letter of credit. We are therefore constrained to ascertain whether such a contract exists before passing to the issue of how letter of credit law would apply if there were no such underlying contract.

App., Queensland, 1961) Qd.R. 518, 531, 533 (sale of land); *Thorby and Others v. Goldberg and Others* (High Ct., 1964) 112 C.L.R. 597, 604–05 (infusion of capital into a company). The *Mason* court cites approvingly to "the 'fair and broad' approach to the construction of a businessman's draft" described in an English opinion, *Hillas and Co., Ltd. v. Arcos Limited* (1932) 147 L.T. 503, 514 (sale of land), and further recites Lord Tomlin's warning in that case that:

> the problem for a court of construction must always be so to balance matters, that without violation of essential principle the dealings of men may as far as possible be treated as effective, and that the law may not incur the reproach of being the destroyer of bargains.

*Mason*, Qd.R. at 528 (*quoting Hillas*, 147 L.T. at 512).

When defendant caused the June 28 letter to be delivered to Horn and Consentino—respectively an officer of and counsel for plaintiff and Reefer—it knew: that a letter of credit for $500,000 in plaintiff's favor was an essential element of the deal; that the letter of credit was to secure payment on the charter parties for the Kumul and Lakatoi; that the charter parties extended into the future, well past June 30, 1986; and that the Australian half of the closing was to take place almost immediately. Defendant informed Horn and Consentino that it was physically unable to issue a letter of credit within the required time frame and instead sent the June 28 letter to the closing. Addressed to Reefer and delivered that day to Horn and Consentino, this letter stated that defendant "undert[ook] to issue" the letter of credit "in the form provided by your company, or as mutually agreed upon between your company and the Bank." Having received this "undertaking" to establish the letter of credit while acting as representatives of plaintiff and Reefer, and in reliance on that "undertaking," Horn and Consentino proceeded to close on the sale to the Bapopo group of half of Refrigerated. Based upon the above, we conclude that the June 28 letter is indeed a contract to issue a letter of credit in the sample form provided or as later mutually agreed.

Defendant's arguments that the June 28 letter could not possibly be a contract are unpersuasive. For example, defendant states that the requisite intent [9] between the parties to form a contract is not manifested in that letter, which, it contends, was no more than a statement of what it planned to do in the future, or an accommodation of a client's request. Defendant further argues that no contract could have been intended because: no bank would commit itself to a letter of credit for an indefinite period of time or without an indemnification agreement from Refrigerated (the indemnification agreement was not signed until the actual letter of credit was issued); the letter was addressed to Reefer, not plaintiff; the letter was missing key terms and descriptions and lacked consideration; the phrase "or as mutually agreed upon" signifies the absence of an agreed-upon contract. Finally, defendant urges that laches forbids plaintiff from now seeking reformation of the letter of credit. We address these contentions in turn.

We believe the June 28 letter cannot be characterized as a "comfort letter" or letter of future intent. In this respect we observe that defendant itself chose the language utilized in the letter, and chose to employ a "word of promise." In *Commonwealth Bank of Australia v. T.L.I. Management Pty. Ltd.* (Sup.Ct. Victoria) [1990] V.R. 510, the court held that even where one party relies on intentions stated in a "comfort letter," such reliance does not transform the comfort letter into a contract without the clear intent to make a contract. *Id.* at 514–15. However, in so holding the court noted that

> the draft did not, in my judgment, contain words conveying to the defendant the idea that [it] would be undertaking a contractual obligation. It would have

9. Defendant correctly observes that Australian law requires an intent to contract. *See Air Lakes Pty. Ltd. and Others v. K.S. Easter (Holdings) Pty. Ltd.* (Ct.App.1985) 2 N.S.W.L.R. 309, 336.

been very simple, if that had been intended, to have used words of promise, such as "we agree," "we *undertake*," or even "we promise."

*Id.* at 515 (emphasis added).

Defendant's use of the word "undertakes" in the June 28 letter, while not thus mystically transforming it into a contract, nevertheless reinforces our concluding that a contract was intended.

It is clear that defendant knew the essential linkage between the charter parties and the letter of credit. So while the termination date of "45 days after the later of the last-possible-day ..." plaintiff included in its draft form would certainly extend the letter of credit for far more than a year and for a time period not immediately ascertainable from the document itself, such a termination date would clearly be expected by defendant in the context of the deal giving rise to the letter of credit. Nor is the proposed period of time indefinite; even if the charter parties were extended, there would always be a document by reference to which the ultimate termination date could be calculated. Moreover, while it is arguably inadvisable to contract to issue a letter of credit before procuring indemnification from the requesting party, we cannot conclude that to do so is either impossible or, in the circumstances of this suit, so irrational as to prevent our determining that the June 28 letter is a contract. The rushed timing and complexity of the closing, the dire need for the letter of credit, the nature of the relationships between Refrigerated and defendant and among Reefer, plaintiff, and Refrigerated, and the brief one-week period during which no indemnification agreement existed vividly describe a situation in which even such an important detail could be overlooked.[10]

Nor do we believe that the fact that the June 28 letter is addressed to Reefer and not plaintiff bars our concluding that it is a contract. Plaintiff and Reefer share the same officers and offices and are both mentioned in the June 28 letter and the "form" (of the letter of credit) referred to therein. While defendant contends that it wrote the June 28 letter and issued the letter of credit at Refrigerated's request, the only testimony or documents before us show that it was Horn and Consentino, respectively vice-president of and counsel for plaintiff and Reefer, who specifically requested both documents. And while there is of course a distinction between plaintiff and its parent Reefer, the evidence shows that defendant did not customarily observe such distinction. Thus defendant noted the beneficiary of the letter of credit as "Reefa" in a September 1988 letter and as "Reefer US" in a April 1987 internal document. Finally, the June 28 letter was delivered at the Refrigerated closing to Horn and Consentino, and we cannot say, given the purpose of the letter and the circumstances under which it was written and delivered, that they were there acting solely on the behalf of Refrigerated, the party on whose behalf the letter was issued, or even Reefer, the party to which it was addressed.[11]

Defendant's contention that the June 28 letter cannot be a contract because it "did not include any definitions, terms, costs, signature lines, or other items that one would expect in a contract of this magnitude"—essentially, that it does not look like a contract—is also unpersuasive. We have concluded that the June 28 letter is a contract to issue a letter of credit. Such a contract can be quite straightforward, so there is no reason to expect the presence of definitions, terms, etc. We therefore at-

---

10. We note that inasmuch as the Letter of Request and Indemnification Refrigerated signed on July 5, 1985 when it signed the letter of credit contains no termination date, and is clearly coterminous with the letter of credit, the indemnity remains valid so long as does the letter of credit.

11. In this regard we find it telling that the letter was addressed to Reefer rather than Refrigera-

ted, the party that requested the letter of credit. Although defendant apparently argues that it so addressed the letter as a courtesy to Refrigerated, the only evidence before us on this matter are the subsidiary relationships between Reefer and both Refrigerated and plaintiff, and defendant's penchant for addressing the subsidiaries as Reefer.

tach no particular meaning to their absence.

■ With respect to the absence of consideration as between plaintiff and defendant, we note that the June 28 letter was a necessary predicate to the closing held on that day, since no deal could be consummated without a letter of credit in place. Defendants were aware of this requirement, and, physically unable to issue such a letter of credit, provided the June 28 letter in its place. Upon receipt of and in reliance on that letter the closing—from which defendant benefitted in various ways, the most easily described of which was payment in full by Refrigerated of all outstanding debts to defendant—duly took place. We believe that these circumstances, and the fact that they arose in a commercial context, satisfies the requirement of consideration. *See Trident General Insurance Co. Ltd. v. McNeice Bros. Pty. Ltd.* (Ct.App. New South Wales 1987) 8 N.S.W.L.R. 270, 274.

■ Additionally, we cannot agree with defendant's contention that the presence of the phrase "or as mutually agreed upon" renders the entire June 28 letter so fatally indeterminate that it cannot be held to be a contract. That letter seems to us particularly immune to a challenge of ambiguity. It is a simple agreement to issue a letter of credit in "the draft form provided ... or as mutually agreed upon." With respect to the choice of using "the draft form provided," the July 5 letter of credit ultimately issued is identical in all respects to the draft version, except the termination date and name of the issuing bank. Thus defendant cannot argue that the draft was in any way ambiguous.

As for the option of "as mutually agreed upon," Australian courts have ruled that the presence of a contract term modified by the phrase "or as mutually agreed" does not render a contract so uncertain as to be unenforceable.[12] Nor does the prospect of further memorialization—such as the issuance of the letter of credit reflecting the draft or terms mutually agreed upon—undermine what is otherwise a contract.[13] After a contract is reached, parties can mutually agree to different terms,[14] or they can mutually agree to abandon the contract;[15] either way, the key is mutual agreement. And, as defendant points out, under Australian law the question of whether the parties intended to make a contract "must be determined objectively, with reference to the surrounding facts and circumstances as well as the working of the alleged contract." Def.Memo. in Opposition at 26 (*citing Australian Broadcasting Corp. v. XIVth Commonwealth Games Ltd.* (Ct.App., New South Wales, 1988) 18 N.S.W.L.R. 540, 549).[16] We find

**12.** *See, e.g. Sidney Eastman Pty. Ltd. v. Southern* (Sup.Ct. New South Wales, 1963) 80 W.N. (N.S.W.) 548, 550 (no uncertainty created where "what was intended between the parties was that the contract should be upon the terms stated in the document unless the parties agreed, at some other time, to different terms"); *Payne v. Prior* (Sup.Ct. New South Wales, 1949) 66 W.N. (N.S.W.) 162, 163 (court untroubled by "alternative expressed, that is the prospect of mutual agreement ... the court should be astute to find that the document is certain in its terms as between the parties, rather than to find it is so uncertain as to become completely unenforceable").

**13.** *See Air Great Lakes Pty. Ltd. and Others v. K S Easter (Holdings) Pty. Ltd.* (Ct.App., New South Wales, 1985) 2 N.S.W.L.R. 309, 320–21 (after there has been an agreement, but the parties' lawyers are to draw up a formal contract, "the fact that ... a more formal contract may contain terms not yet agreed upon does not preclude the existence of a concluded contract").

**14.** *See Universal Guarantee Pty. Ltd. v. Carlile* (Sup.Ct., Victoria) [1957] V.R. 68, 74 (later document with different terms sent in error does not change contract unless the parties are mutually agreed on new terms); *Dinan v. Harper* (Sup.Ct., Victoria) [1922] V.L.R. 49, 58 (a completed contract cannot be altered by later negotiations unless mutually agreed upon).

**15.** *See Air Great Lakes Pty. Ltd. v. K S Easter (Holdings) Pty. Ltd.* (Ct.App., New South Wales, 1985) 2 N.S.W.L.R. 309, 324 (and cases cited).

**16.** Defendant argues that *Australian Broadcasting* holds that internal communications are irrelevant to proving intent to contract. On the contrary, the court merely observed that the internal communications sought to be used in that case were unhelpful and contradictory, stating that "it will often be necessary to identify with some care the fact which is said to have been admitted." Defendant's internal communications and the communications between it and entities other than plaintiff do not in any way

defendant's arguments that "form" does not mean "contents," and that plaintiff's silence constitutes mutual agreement to be without merit.

■ Finally, we do not agree that an issue of laches is raised. It is clear that everyone involved believed that the letter of credit was in place right up until plaintiff attempted to draw on it. Thus we cannot say that plaintiff did not act with "all due expedition" in seeking to rectify what it believed to be an error. *Australasian Performing Right Assoc. Ltd. v. Austarama Television Pty. Ltd.* (Sup.Ct. New South Wales 1972) 2 N.S.W.L.R. 467, 472. *See Lindsay Petroleum Co. v. Hurd* (1874) L.R. 5 P.C. 221, 239–40 (length of delay and what parties have done during the interval key factors to laches defense). Moreover, we can see no way in which defendant has been harmed by this mistake. Defendant continued to behave as if the letter of credit were in effect, taking into account the potential liability it represented in all of its credit decisions respecting Refrigerated. Defendant's letters of August 1987 and September 1988 show that its failure to collect fees for the letter of credit was due to its own accounting errors and not the result of its halting such collection because it considered the letter of credit terminated. And, as we determined *supra* note 10, there would have been no need to procure a new indemnification agreement because it runs with the letter of credit. Thus it is difficult to see what other steps defendant might have taken to protect itself.

### CONCLUSION

■ We conclude as a matter of law that the June 28 letter is indeed a contract. There being no evidence of any mutual agreement by the parties to change the form of the draft letter of credit provided by plaintiff, the actual letter of credit instead mirroring the draft in every way except the termination date, we further conclude that the letter of credit must be reformed to reflect the termination date

upon which the parties had originally agreed. Plaintiff shall submit on ten days notice a judgment reflecting our decision and including a reformed letter of credit. SO ORDERED.

---

suffer from the above defects. Rather, they consistently reflect the belief by all involved that the letter of credit was in effect and actions by all consistent with such belief. We find such evidence relevant.